STUDIENGESELLSCHAFT KOHLE mbh, Plaintiff,

v.

NOVAMONT CORPORATION, Defendant,

v.

MAX–PLANCK–INSTITUT FUR KOHLENFORSCHUNG, Dr. Med. Marianne Witte and Dr. Erhart Ziegler, Heirs of Maria Ziegler, and Wilhelm Schmidtmann, Executor of the Estate of Maria Ziegler, Additional Defendants on Counterclaim.

No. 77 Civ. 4722 (RWS).

United States District Court, S. D. New York.

June 30, 1981.

**558**

Sprung, Felfe, Horn, Lynch & Kramer, New York City, for plaintiff; Arnold Sprung, Nathaniel D. Kramer, New York City, of counsel.

Morgan, Finnegan, Pine, Foley & Lee, New York City, for defendant; Harry C. Marcus, New York City, of counsel.

## OPINION

SWEET, District Judge.

This is a diversity action brought by the plaintiff, Studiengesellschaft Kohle m. b. H. ("SGK"), a West German Corporation, against the defendant Novamont Corporation, a Delaware Corporation, now known as U.S.S. Novamont, Inc. ("Novamont"), for royalties allegedly due and unpaid since March of 1977. These royalties are said to arise under a July 1, 1974 agreement licensing certain polypropylene patent properties owned by SGK, including U.S. Patent 3,113,115 (the " '115' " patent).[1] Novamont counterclaimed for compensatory and punitive damages arising out of the alleged breach by SGK of the most favored licensee clause ("the MFL clause") of the Nova-

mont-SGK license agreements. A summary judgment motion on behalf of SGK was denied, other pretrial proceedings were had and the action was tried to the court on February 1, 13, 17 and 20, 1981.[2]

Post trial briefs and proposed findings of fact and conclusions of law were submitted on March 18, 1981, by skilled and learned counsel for both parties who throughout these proceedings provided great assistance to the court in its exploration of the intricacies of the licensing of a valuable and important patent. On the basis of all these proceedings, as set forth below, I conclude that SGK is entitled to judgment granting certain of the relief which it seeks and dismissing all but one aspect of Novamont's counterclaims against the Max-Planck-Institute fur Kohlenforschung ("MPI") and Dr. Med. Marianne Witte and Dr. Erhart Ziegler ("the heirs") and Wilhelm Schmidtmann ("the Executor").

### Findings of Fact

#### Background of the Patent, its Holders and its Licensing

Professor Karl Ziegler ("Ziegler"), who died in 1973, was an organic chemist and served as the director of MPI in Muelheim, Germany in the early 1950's. MPI is a world renown basic research and educational institute. At MPI, Ziegler, together with Dr. Heinz Martin ("Dr. Martin") and others, studied catalytic reactions, several of which produced unexpected and significant results applicable to the production of plastics and synthetic rubbers. Ziegler patented certain of these processes. Included among them

---

1. SGK in its complaint alleged violations of its '115 patent without identifying any particular plant where the violations were said to occur. At the outset of the trial, the parties noted an additional aspect to their dispute. SGK noted that all its discovery and proposed evidence related to the activities of Novamont at its Neal, West Virginia plant, but that certain information indicated the possibility its patent might be infringed by the production of Novamont's LaPort, Texas plant. The parties were unable to stipulate in advance as to the res judicata effect, or lack of it, of the judgment to be entered on this opinion. No facts were adduced in this action concerning the LaPort

plant, the process used by Novamont at that plant or the production figures resulting from that process. This opinion therefore does not address such issues.

2. An understanding concerning the admissibility of exhibits at the time of trial dissolved in the period of post trial reflection. Novamont's motion to strike certain of SGK's exhibits is resolved as follows:

SGK exhibits—139,188—granted.
SGK exhibits—10, 61, 64, 66, 78, 80, 81, 111, 117, 118, 121, 123, 131, 142, 144, 178, 186 and 188—denied.

was the process which received the 115 patent, which was held by Ziegler until his death in 1973. Martin, the present manager of SGK, who testified on its behalf during the trial, also had an interest in the patents, including the 115.

SGK is the present licensor and titleholder of the 115 patent, which it holds in trust for counterclaim defendant MPI. SGK's principal function is and has been to license patent properties and collect royalties for MPI. SGK took title to the patent properties and all rights and obligations thereunder, including those embodied in license agreements, by trust agreement dated October 4, 1973, from the former counterclaim defendant, Maria Ziegler, the wife of Professor Ziegler.

Maria Ziegler, as sole heir and executrix of Ziegler's estate, took title to the patent properties by inheritance upon her husband's death. Both Ziegler and his wife, who died during the pendency of this action, were citizens and residents of West Germany. By memo endorsement dated July 15, 1980, the Court substituted Dr. Med. Marianne Witte, Dr. Erhart Ziegler, and Mr. Wilhelm Schmidtmann, all citizens and residents of West Germany, as defendants on the counterclaim for Maria Ziegler. Drs. Witte and Ziegler are the surviving children of the Zieglers, and sole heirs under a contract of inheritance left by Mrs. Ziegler. Mr. Schmidtmann is the duly appointed executor of Mrs. Ziegler's estate. None of the individual defendants appeared.

Pursuant to a series of agreements between Ziegler and MPI entered into December 22, 1955, Ziegler during his lifetime held legal title to the licensed patent properties and license agreements in trust for and on behalf of MPI, which held all rights and obligations with respect thereto. Ziegler was required by these agreements to follow MPI's instructions with respect to licensing activities and to account and pass along in gross to MPI all royalties collected under the licenses. SGK, pursuant to agreement with MPI of December 22, 1955, was assigned the trust administration of the patent rights arising from Ziegler inventions, including the right to license the patent rights and to compensate the inventors, all at MPI's expense. SGK was at all times contractually required to follow MPI's instructions.

The '115 process patent employs catalysts in the production of propylene and co-polymers. The catalysts are "used to cause small molecules of gases or liquids to react together to form solid plastics and synthetic rubbers from which commercially useful articles and objects may be fabricated for use in everyday living," *Ziegler v. Phillips Petroleum Company*, 483 F.2d 858, 861 (5th Cir.), *cert. denied*, 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973). The '115 patent was issued on December 3, 1963 on an application filed on October 29, 1958 and expired on December 3, 1980. Montecatini-Edison S.A. ("Montecatini") participated in the research leading up to the patent, and after the patent was issued, Montecatini became Ziegler's agent with respect to licensing the patent in the United States. In the early days after Ziegler's discovery, many of those seeking to produce plastics visited Muelheim to learn about the process. In 1954, a license agreement was entered into between Ziegler and Hercules Powder Company ("Hercules") under which Hercules commenced the production of propylene. That agreement was amended in 1964. In 1967, a license agreement covering the use of the '115 patent was entered into between Ziegler and Novamont under which Novamont commenced production.

Other producers of propylene, however, refused to take licenses from Ziegler and became infringers in his eyes and in the view of his licensees. Included in this group were Dart Drug Company, Eastman Kodak and Phillips Petroleum. Phillips Petroleum produced propylene at its Monument plant, which it subsequently sold to Diamond Shamrock Chemical Company ("Diamond Shamrock") and, as part of the sale, undertook to hold Diamond Shamrock harmless against any infringement claims. By letter of May 23, 1969 Hercules formally notified Ziegler of infringements of his patent in accordance with their agreement.

Early in 1970 Ziegler's counsel sent letters to Diamond Shamrock, Phillips Petroleum, Eastman Kodak and Dart Drug seeking to obtain those companies as licensees. By July 9, 1970 Ziegler had entered into a patent license agreement and certain other agreements with Diamond Shamrock. These agreements will be considered in greater detail below, since aspects of them are claimed by Novamont to violate its preexisting MFL clause. Notwithstanding, by letter of September 23, 1970, Hercules gave notice to Ziegler of its suspension of royalty payments, since the infringements of which it had complained had not abated nor had the infringers been sued.

Ziegler thereafter commenced an infringement action against Phillips, which included a challenge to Phillips' unlicensed production of propylene. On June 23, 1971 the Honorable Sarah Hughes of the United States District Court for the Northern District of Texas declared the patent valid but not infringed by Phillips' use of the catalyst. Ziegler appealed the decision. Novamont, on July 9, 1971, notified Ziegler of its discontinuance of the payment of royalties; Ziegler protested the action. On March 24, 1972 he gave Novamont notice of termination of the 1967 agreement between them.

In the meantime, Ziegler sought to resolve his differences with Hercules, and negotiated with it to that end. These efforts were successful. On April 26, 1972, an agreement was entered into between Hercules and Ziegler. The details of that agreement will be considered below, since it and its implementation in 1974, in addition to the Ziegler/Diamond Shamrock agreement discussed above, are claimed by Novamont to violate Novamont's 1967 MFL clause.

Despite correspondence and negotiation, further licensing under the '115 patent remained in limbo awaiting the determination by the Fifth Circuit of Ziegler's appeal from Judge Hughes' decision. This was announced on April 13, 1973. The Fifth Circuit restored Ziegler's patent position against Phillips with respect to the use of the patent. Shortly thereafter, on May 6,

1974, Diamond Shamrock and Ziegler reached an agreement on the basis of their earlier 1970 understanding. During the same period, the discussions between Novamont and Ziegler intensified and on July 1, 1974 the agreement was entered into which is the basis of SGK's claim for unpaid royalties in this action.

Thereafter, Novamont obtained certain information concerning the Diamond Shamrock agreement and in August, 1977, announced its intention to adopt the provisions of the Diamond Shamrock license and to discontinue the payment of royalties, actions it claimed to be entitled to take by virtue of its MFL clause. This action by SGK to recover royalties followed. Novamont counterclaimed on the basis of its MFL clause. After discovery in this action, Novamont successfully moved to amend its counterclaim to include a claim arising out of the alleged violation of its MFL clause by the Hercules agreement. 485 F.Supp. 471.

It is against this background that further consideration must be given to the Ziegler/Diamond Shamrock Agreements, the Ziegler/Hercules Agreement and the Ziegler/Novamont Agreements.

### The Ziegler/Diamond Shamrock Agreement

Diamond Shamrock had purchased the Monument Plant for making propylene from Phillips before Novamont and Ziegler entered into their 1967 agreement. Phillips operated the plant for Diamond Shamrock's benefit initially and also gave Diamond Shamrock a commitment to hold Diamond Shamrock harmless in the event of a determination at a later time that the process employed at the plant violated any patent rights.

After Hercules, an early Ziegler licensee, as set forth above, gave its notice of the infringement of other manufacturers in May, 1969, Ziegler's representatives, early in 1970, sought to enter into a license agreement with Diamond Shamrock. It was, of course, Ziegler's position that Diamond Shamrock was infringing his patent as was

Phillips. Negotiations were held in mid-April and continued until July 9, 1970 when Diamond Shamrock and Ziegler reached an understanding which was set forth in three agreements.

The first agreement was a patent license agreement which granted Diamond Shamrock a non-exclusive license under Ziegler's '115 patent to make, use and sell propylene in the United States. Diamond Shamrock agreed to make a down payment of $200,000 to be credited at a 50% rate against future royalties. Royalty rates calculated on volume of sales were agreed upon. It was also agreed that Diamond Shamrock could accrue royalties and account to Ziegler for such accruals during the pendency of any patent litigation involving an alleged infringer bound to hold Diamond Shamrock harmless for infringement, the Phillips' action then being in progress. Dr. Martin, SGK's present Director, characterized this license agreement as the agreement which thereafter became the standard propylene agreement offered to licensees by Ziegler.

In addition, an option agreement was entered into permitting Diamond Shamrock to obtain a license covering certain co-polymers. Diamond Shamrock paid $20,000 for this option. It was agreed that upon its exercise an additional $30,000 would be paid, both sums to be credited against future royalties. This option, though granted, was never exercised.

Finally, as an integral part of the agreement, Ziegler sent Diamond Shamrock the following undated letter:

Law Department
Diamond Shamrock Chemical Company
300 Union Commerce Building
Cleveland, Ohio 44115
U.S.A.

Gentlemen:

We have entered into a license agreement concerning the polypropylene field, effective July 1, 1970.

It is understood and agreed that this license agreement does not cover any alleged infringements of my patent rights by Diamond Shamrock prior to this July 1, 1970 date and that my rights to sue or take any other action against Diamond Shamrock or any other party in interest concerning this alleged past infringement are preserved.

I furthermore agree that, should there be any recovery by me, my successors, heirs or assigns for this past infringement by Diamond Shamrock as a result of suit, settlement, or otherwise, such recovery shall additively be credited to the down-payment made in accordance with Paragraph III of the license agreement in the same manner as if the same had initially constituted part of the down-payment actually made, and shall be credited against royalties as provided in the license.

Thereafter, Diamond Shamrock accounted and accrued royalties. After the final resolution of the Fifth Circuit decision in June of 1973 reversing the District Court and holding Phillips an infringer of Ziegler's patent, Arnold Sprung ("Sprung"), counsel for Ziegler at the time and trial counsel for SGK in this proceeding, opened negotiations with Diamond Shamrock concerning its accrued royalties and the pre July 1970 infringements.

March 27, 1974
Diamond Shamrock Chemical Company
Law Department
1100 Superior Avenue
Cleveland, Ohio 44114

*Attention* : John C. Tiernan, Esq.

*Re: Ziegler Polypropylene License*

Dear John:

This is to confirm our telephone conversation of today.

If Diamond Shamrock is agreeable to immediately render an accounting and make payment, we would consider the alleged breach of the Polypropylene License of July 1, 1970, rectified.

I have telexed Studiengesellschaft Kohle mbH to forward Diamond Shamrock the statement required by Article VI of the agreement, and agree hereby to hold your royalty payment check in escrow, pending your receipt of the written statement, as set forth in Article VI.

I also confirm that I am willing to enter into negotiations concerning Diamond Shamrock's polypropylene production going back prior to July 1, 1970, and suggest that we get together for this purpose, should you desire.

Best personal regards,

Very truly yours,

BURGESS, DINKLAGE & SPRUNG

By May 6, 1974 these negotiations were concluded by an agreement between Ziegler and Diamond Shamrock which provided that an additional $750,000 would be paid by Diamond Shamrock and

"additively credited to the down-payment made in accordance with Paragraph III of the license agreement of July 1, 1970, in the same manner as if the same had initially constituted part of the down-payment made, and shall be credited against royalties as provided in the license, i. e., no more than fifty percent (50%) of any payment otherwise due pursuant to Paragraph IV of the license for any one year shall be credited against the total down-payment".

Diamond was released thereby from any liability for pre July 1, 1970 infringement.

In terms of its continuing running royalty, aside from the effect of the down payment, the Diamond Shamrock rates were slightly more favorable than those held by Novamont in 1970, although certain third party payments as offsets were not included and other differences existed between the agreements. For reasons not made clear on this record, when given terms of the Ziegler/Diamond Shamrock agreement in the fall of 1970, Novamont chose not to adopt its terms.

#### The Ziegler/Hercules Agreements

Hercules was one of the early participants in the work of Dr. Ziegler and entered into a Polyolefin Contract with him on September 24, 1954, which was amended in 1962 and supplemented in 1964 in ways not material to this dispute. By the late 60's Eastman Kodak, Dart Drug and Phillips, who declined to enter into license arrangements with Ziegler, were producing polypropylene also. As noted above, in May, 1969 Hercules gave notice of this infringement under its agreement with Ziegler, and a period of negotiations ensued.

Hercules twice extended the period during which Ziegler could abate the infringement or file suit against the infringer and then, on September 23, 1970, gave notice that it would suspend payment of royalties after April, 1970. Sprung believed this to be a negotiating position looking toward a reduction of royalties. To resolve the matter he proposed that the 115 patent be deemed to expire 3 years before its actual termination date for purposes of calculating Hercules' royalty obligations, and that Hercules agree that Ziegler need sue only one infringer at a time. Hercules apparently kept this proposal in mind, but its interest in an immediate resolution of this dispute over the terms of the license agreement was undoubtedly affected by the lower court decision in the *Phillips* action in mid-1971. The situation was reported by Hercules to Ziegler on July 12, 1971 as being "far more complicated that I [the Hercules Assistant General Manager, Polymers Department] realized." In an exercise of personal diplomacy, Von Kreisler, one of Ziegler's close associates, wrote Brown, President of Hercules, calling upon personal and past business ties to bind up the dispute. In November, 1971, Brown responded, refusing to pay royalties but seeking to keep the discussions alive.

Thereafter the negotiations moved forward in a deliberate and calculated fashion. Hercules estimated its exposure and Dr. Martin and Sprung evaluated the Ziegler position, recognizing that Ziegler's leverage depended in large measure on the successful resolution of the appeal in the *Phillips* action. On February 1, 1972 Hercules proposed a $1,250,000 non-refundable down-payment, a fully paid-up license up to a capacity of 600 million pounds a year and a royalty of 1% of net sales in excess of that quantity.

Sprung, having received this Hercules proposal, forwarded it to Muelheim together with the computer run upon which the

$1,250,000 down payment was determined. This calculation included a royalty rate of .73% of the projected capacity to produce polypropylene and a projection of the future price of polypropylene based on past price movements, a projection which showed a decrease of the price over the next six years. The royalty rate was the minimum rate agreed upon in the 1964 supplement to the original Ziegler/Hercules agreement. The calculation implicitly accepted the earlier suggestion of Ziegler with respect to a three year advance in the termination date, for the calculation ran only through 1977. A present value of money factor of 12% was applied. The cumulative present value of the royalties came out to $1.656 million dollars, which Hercules then reduced to $1.2 million as a settlement figure. Sprung proposed to Ziegler a reply to Hercules to the effect that either a 25% settlement reduction from $1.6 million to $1.25 million or the three year earlier termination would be satisfactory, but not both. Sprung pressed for consideration of the proposal noting: "This may be last opportunity to obtain substantial royalty payments prior to decision on appeal in Phillips' suit."

On February 21, 1972 Dr. Martin, on Ziegler's behalf, sent Sprung a computer run including 1970 and 1971. The results of the run varied from the Hercules price calculation as a result of the period covered. Hercules had started its projection in 1968 and Ziegler noted that a 1967 starting date would produce a significantly higher price and consequently an increased dollar value for sales in the future projections. The effect of a constant price calculation was considered, and Dr. Martin concluded that under Ziegler's calculations averaging its two methods of calculating price and continuing through 1980, a 75% settlement would require a $1.7 million dollar downpayment.

On March 16, 1972 Sprung and Dr. Martin met with Hercules, and an agreement was arrived at. This agreement was formalized by letter from Hercules on April 26, 1972, and accepted by Ziegler. It amended the prior 1954, 1962 and 1964 agreements and provided as follows:

1. In settlement of any and all liability for royalties accruing under the Polyolefin Contract for the period April 1, 1970 through December 31, 1972, Hercules will pay Ziegler $770,000.00 promptly after your acceptance of this letter.

2. As consideration for immunity from suit after December 31, 1972, as granted in paragraph 5 hereof, Hercules will pay Ziegler $30,000.00 promptly after your acceptance of this letter. In addition, when and if Ziegler receives a favorable decision on the validity of U.S. Patent 3,113,115 (without regard to the decision on infringement of said patent) from the Court of Appeals in the pending *Ziegler v. Phillips* Civil Action in Texas, Hercules will promptly pay Ziegler $800,-000.00 plus interest from May 1, 1972 at 6%.

3. All payments to Ziegler under paragraphs 1 and 2 shall be non-refundable to Hercules by Ziegler.

4. In the event U.S. Patent 3,113,115 is held invalid by the Court of Appeals in the above-mentioned Civil Action, Hercules will be excused from the $800,000.00 payment referred to in paragraph 2 hereof but in such event the immunity from suit granted in paragraph 5 hereof shall not apply to any process patent that Ziegler may hereafter obtain corresponding substantially in scope to U.S. Patent 3,113,115 unless Hercules shall within a reasonable time after issuance of such patent make said $800,000.00 payment.

5. Ziegler hereby grants Hercules a fully paid-up immunity from suit until December 3, 1980 under Professor Ziegler's U.S. Patent rights with respect to polypropylene (including non-elastomeric copolymers with a minor amount of ethylene) up to a limit of six hundred million pounds (600,000,000) per year sales. On any sales quantity of polypropylene over six hundred million pounds (600,000,000) per year, Hercules will pay royalties of one percent (1%) of Net Sales Price.

Dr. Martin testified that the schedule of payments was determined by Hercules' tax

considerations and that he considered the settlement to constitute a payment of $1.6 million dollars in settlement of all past infringement and in payment for the "fair value" of the paid-up license.

Q What was your belief that the $1.6 million figure we had negotiated represented?

A It was my true belief that this was the fair value of the residual time up to '80 of the Hercules agreement.

. . . . .

Q I notice in [the agreement] it does not simply say they're going to make two payments of $800,000 each. They have a sum in paragraph 1 of 770 and in 2 of 30,000 and so forth.

Q What was your understanding of those segregations of those sums?

A The sum is right. It comes out to 1.6. Hercules had some desire to divide up because of tax purposes the first 800,000.

Q For their own convenience?

A Yes.

A handwritten exhibit was introduced of notes which Dr. Martin testified were made by Sprung during the meeting and exchanged with him. These notes confirm the testimony of Dr. Martin as to the Ziegler view of the agreement. The notes contain figures which were said to represent the initial positions of the parties and the rejection of those positions. Then there follows a calculation which Martin explains as follows:

CONTINUED DIRECT EXAMINATION BY MR. SPRUNG:

Q When we adjourned you were discussing the Hercules meeting.

I now hand you an exhibit which has been marked as Plaintiffs' Exhibit 104. I ask you if you can identify the scribbling?

A Yes.

Q Tell us what that is?

A This was the written correspondence between us two during the meeting with Hercules.

Q Could you explain what those various figures are and what the significance of them are.

A I can try. In the first left, upper left corner, we started with the figure Hercules had offered us and below this figure the new figure we computerized. Then we crossed this out.

Q Which figure is that?

A The 2.318.

Martin's testimony continues with a detailed description of the calculations made. It indicates that however Hercules reached its calculation of the $1.6 million dollar down-payment, Ziegler considered it on the basis of a royalty extending through the life of the patent, using a projected price and consequent sales volume established on a historical basis. According to Dr. Martin, this amount was reduced by a present value calculation, and then further reduced by an amount calculated to offset the increased royalty rate contained in the agreement on the excess of the paid-up production over 600 million pounds, in order to keep the rates consistent with the previous Hercules rate. This amount was then further reduced by an arbitrary 20%, urged upon Ziegler by Hercules, which represented a reduction of the estimated volume figures which had been the result of a computer calculation of production capacity based on a time projection. That reduction was said to be required by experience which established that unforeseen delays as a consequence of construction lags, labor disputes and other factors could well cause deviations from the computer projections.

There is substantial evidence, including the memorandum submitted to Hercules' executive committee on April 7, 1972 which sought approval of the agreement, that Hercules never changed its method of calculating the $1.6 million figure, and continued to view that figure as reflecting a forgiveness of royalties for three years at the end of the patent period. Another difference between the methods of calculation of Hercules and Ziegler was the treatment of the royalties accrued during the period of Hercules non-payment, the question being whether they were forgiven, discounted or included in the total down payment.

Regardless of the different calculations said to have been used to reach the $1.6 million figure, there is no dispute as to that figure and the terms of the license agreement. The letter agreement spoke simply of the payment of $770,000 in settlement of all past royalties due for the period of suspension, $30,000 in consideration for entering into the relationship and $800,000 to be paid upon a favorable decision in the *Phillips* action. For these payments Hercules received a license over the life of the patent and was required to pay royalties equivalent to 1% of all net sales over 600 million pounds annually.

### The Ziegler/Novamont Agreements

In 1964, a license agreement was entered into between Ziegler and Novamont. On December 21, 1967 this agreement was terminated and was superseded by an agreement entitled "Propylene Ziegler Patent License Agreement." Montecatini, the then parent of Novamont, signed the agreement on behalf of Ziegler as his licensing agent.

The agreement licensing the use of the 115 patent by Novamont contained 19 articles and consisted of 19 pages. For the purpose of this action only Article IX need be set forth in its entirety. It follows:

*ARTICLE IX—Most Favored Licensee Clause*

A. 1) Should Licensor, during the life of this Agreement, grant to any company producing Agreement Polymers in the United States a license under United States patent 3,113,115 which license contains royalty provisions that, when considered in their entirety, are more favorable than those specified in Article III hereof, then and in that event Licensor shall promptly furnish Licensee with the full text of the royalty provisions of such license.

2) Licensee shall be entitled, upon written request within ninety (90) days after receipt of the aforesaid full text of such other license from Licensor, to substitute for the entirety of this Agreement all of the provisions of such other license.

3) The substituted license shall be effective and this Agreement suspended as of the date of the request for substitution of terms by the Licensee.

4) If the substituted license ceases to be in force during the time period in which this Agreement would have been effective but for such substitution, then and in that event the suspension of this Agreement shall be terminated and this Agreement shall again be binding upon the parties for the balance of its term.

D. In no case shall any provision of this Article IX be construed to impose any obligation on Licensor to repay to Licensee any royalties previously paid pursuant to this Agreement or any antecedent license agreement under United States patent 3,113,115.

Novamont paid royalties under this agreement during the period from 1967 until mid-1971, although Novamont sought unsuccessfully to modify the agreement in the light of the competitive situation in the United States including the infringing activities of others.[3] It was also during this period that Hercules gave its notice of infringement to Ziegler and that Diamond Shamrock and Ziegler entered into their agreements of July 9, 1970 already discussed. Indeed the Diamond Shamrock agreement was discussed by Ziegler and Novamont during this period.[4]

From the documents submitted, the correspondence, and the testimony of Dr. Martin, it appears that despite efforts at secrecy, most information concerning license

---

**3.** Both parties were ably represented, not only during the trial but during these negotiations, which have been the subject of extensive discovery in this action under the able direction of Magistrate Leonard Bernikow, and in other litigation as well. For example, a virtually verbatim 49 page record of the meeting between the parties in Muelheim on March 2 and 3, 1971 is available for the court's enlightenment.

**4.** It should be noted that the "divorce" between Novamont and Montecatini had been achieved and Novamont no longer had any relationship to Ziegler's former licensing agent.

agreements soon found itself shared in the industry. By letter of September 24, 1970 Novamont sought to enlist Montecatini's help in obtaining relief from royalties due Ziegler in view of the widespread infringement. Within two weeks, Smareglia of Novamont sought to obtain from Montecatini information about the Diamond Shamrock agreement which had been reached on July 9, 1970. On October 14, 1970, Manzillo, President of Novamont, confronted the Ziegler representatives with the "rumors" and requested the Diamond Shamrock agreement under Novamont's MFL clause.

By letter of October 30, 1970 Sprung forwarded the Diamond Shamrock agreement along with a letter from Diamond Shamrock of September 4, 1970 confirming that the agreement did not cover past infringement. The Diamond Shamrock letter duplicated the Ziegler undated letter relating to infringement, quoted above, entered into at the time the agreement was signed. However, the Diamond Shamrock letter omitted the third paragraph of Ziegler's letter which, as indicated above, stated as follows:

> I furthermore agree that, should there be any recovery by me, my successors, heirs or assigns for this past infringement by Diamond Shamrock as a result of suit, settlement, or otherwise, such recovery shall additively be credited to the down-payment made in accordance with Paragraph III of the license agreement in the same manner as if the same had initially constituted part of the down-payment actually made, and shall be credited against royalties as provided in the license.

Neither this paragraph nor the option agreement relating to co-polymers was ever shown to Novamont. The terms of those documents are claimed by Novamont to be more favorable to the licensee than the terms of Novamont's agreement were to

Novamont; their concealment is therefore claimed to violate its MFL.[5]

Ziegler's representative did offer the revealed terms of the Diamond Shamrock agreement to Novamont, without requiring a $200,000 down payment, but also without giving credit for prior royalties paid. At a meeting on November 6, 1970, Ziegler's representatives refused to grant Novamont the right to accrue, rather than pay, the royalties due during the period of the *Phillips* litigation. Although Novamont was offered the literal terms of the Diamond Shamrock provision pertaining to accrual, those terms applied specifically to Diamond Shamrock in its position as the beneficiary of the hold-harmless agreement with Phillips, and would have bestowed no right to accrue during the pendency of the Phillips' suit on Novamont. The Diamond Shamrock accrual provision, in pertinent part, reads as follows: "Licensee may hold and accrue royalties without forwarding the same to Ziegler during any period during which Ziegler is engaged in a suit for patent infringement involving the process utilized by Licensee and being defended by a party under a contractual obligation to hold Licensee harmless." Novamont, based on the information it had received, made no effort to obtain the Diamond Shamrock terms.

Still seeking relief from its license agreement and the competitive situation in the U.S. market, Novamont gave notice on July 9, 1971 of its discontinuance of royalty payments in the wake of the *Phillips* lower court decision. Sprung turned his attention to Hercules and concentrated his efforts on resolving the Ziegler/Hercules dispute. As set forth above, by March 17, 1972 an agreement seemed close at hand, and was in fact reached on April 26, 1972. In the meantime, on March 24, 1972 Sprung sent Novamont a notice of cancellation of its 1967 license arising out of its termination of royalties in July of the prior year.

---

**5.** In this connection it is noted that the option was never exercised. *See* pp. 560–561, *supra.* As to the third paragraph, as noted above, after the *Phillips* action was decided in favor of Ziegler in 1973 and all further appellate proceedings subdued, Diamond Shamrock and Ziegler entered into the agreement of May 6, 1974 which provided for an additional payment of

$750,000 to be "additively credited" to the down-payment already made and to constitute a credit against 50% of future royalties annually until exhausted. This agreement gave effect to the third paragraph of Ziegler's July, 1970 letter and is claimed by Novamont to complete the breach of its MFL clause.

By May, 1972 Novamont had gotten wind of the Hercules agreement and claimed a right to enforce its MFL clause. It chose to disregard Ziegler's claim that it was an infringer. Sprung informed Novamont that Hercules had a paid up license and by June 26, 1972 offered to calculate a paid up license on the same basis, namely, $1.6 million for a capacity of 600 million pounds a year. By letter of July 19, 1972 Sprung stated:

> The royalty rate on which the computer calculations were made was the royalty rate in Hercules' existing agreement with Professor Ziegler of which I believe you are cognizant. The prepaid discount was at 12%. Quite simply, Hercules agreed to pay a royalty of $1,600,000, immediately paying $800,000 and agreeing to pay a further $800,000, plus 6% interest, upon the decision of the 5th Circuit Appeals Court provided that they did not reverse the District Court and hold the '115 patent invalid. There were no other contingencies provided.

Pressed further by Novamont, Sprung wrote the following on August 28, 1972:

> Apparently, I have not been too clear in my proposals to you. Hercules' royalty rate has nothing to do with the arrangement that Professor Ziegler is willing to offer to Novamont in order to enable Novamont to obtain a paid-up license. A paid-up license would only be made available by taking Novamont's present agreement and on the basis of a computer run, taking into consideration a diminishing price for polypropylene, to project the royalties which would be due from Novamont over the life of the patent up to the maximum plant capacity provided for, and to calculate on this basis, taking into consideration a 12% discount, a paid-up value.

Sprung thereby did not reveal the .73% royalty rate previously obtained by Hercules on which the calculation was based, nor did he reveal what Dr. Martin in a June 21, 1972 telex to Sprung on the subject referred to as the "further admitted discount to Hercules." Although this discount could refer to the alleged three-year free ride, the preponderance of the evidence indicates that it refers to the 20% contingency discount intended to account for risks in achieving the anticipated increased capacity, a discount not mentioned to Novamont in Sprung's August 28, 1972 letter.

The evidence indicates three possible sources of this 20% discount: the forgiveness of the accrued royalties for 1971 and 1972; the alleged three-year free ride from 1977–1980; and the 20% contingency to allow for construction delays and other unexpected obstacles to the achievement of the projected, unusual capacities. While, as indicated, the evidence preponderates that the contingency factor was the element used in Ziegler's calculations, in any case, none of three possible sources was described to Novamont in Sprung's August 28, 1972 letter.

There the matter lay until the decision of the 5th Circuit in April, 1973. One month after that decision, Manzillo filled in the blanks, as had been suggested by Sprung in his offer of August of 1972 and expressed interest in negotiating. Sprung replied, offering to settle the infringement claim for $650,000 and offering a paid-up license for 120 million pounds of capacity for 1.2 million dollars. In authorizing this proposal, Dr. Martin used nearly the same methodology as had been employed in the Hercules computation. However, there were several significant differences, two of them tied to conditions in the polypropylene and money markets and one reflecting differences between the underlying Hercules and Novamont license agreements. The Hercules lump-sum had been calculated at a time when polypropylene prices were decreasing, and the calculations had taken that trend into account. However, Ziegler's offer to Novamont was based on a computed price calculation that was flat throughout the seven year period. Although, according to Ziegler, polypropylene projected prices then showed an increase which would have resulted in increased royalties a constant price was chosen for use in the Novamont calculations in an effort to avoid discrimina-

ting against Novamont and in favor of Hercules in view of the changing pattern of propylene pricing. Another difference between the basis of the two lump-sum offers was that the Novamont figure was arrived at through application of a 10% present value factor, rather than a 12% factor. That change reflected changes in the price of money in the marketplace. Finally, the royalty rate used was Novamont's prior royalty rate, approximately 1.5% as opposed to Hercules .73%. In other regards, leaving aside the issue of the suspended payments by Hercules, the calculations followed the Ziegler view of the Hercules formula, including a 20% discount for unexpected production delays. Although not a precise duplicate of the Hercules calculation, it constituted a rough approximation. Novamont was not informed of the three year grace period proposal.

Despite meetings in November, 1973 and March, 1974, the parties were unable to reach agreement. Finally, with the *Phillips* action resolved and the Hercules down-payments in hand, Ziegler rejected Novamont's proposals. On July 1, 1974 Novamont and Ziegler reached an agreement on the terms demanded by Ziegler.

The relevant terms were as follows:

WHEREAS, NOVAMONT and Professor Dr. Dr. h.c. mult. Karl Ziegler (hereinafter called "ZIEGLER") had entered into an agreement on December 21, 1967, entitled "Polypropylene Ziegler Patent License Agreement"; and

WHEREAS, a disagreement had arisen concerning NOVAMONT'S obligations under said agreement, and ZIEGLER had forwarded a Notice cancelling the agreement, which NOVAMONT had maintained was ineffective; and

WHEREAS, STUDIEN is the successor to the Patent Rights of ZIEGLER and to the rights of ZIEGLER under said agreement of December 21, 1967;

NOW, THEREFORE, in order to settle the differences between the parties, the parties agree as follows:

1. The parties agree that the Notice of termination of the agreement between NOVAMONT and ZIEGLER, dated December 21, 1967, is ineffective and the agreement dated December 21, 1967, remains in full force and effect and is uncancelled.

2. NOVAMONT shall immediately render an up-to-date accounting to STUDIEN for all royalties past due under the agreement of December 21, 1967, including an accounting for the period extending from the first quarter of 1971 to date, and shall immediately make payment of said past due royalties to STUDIEN, plus interest calculated at a rate of ten percent (10%) per annum.

3. As of the date of this Agreement, the agreement of December 21, 1967, shall be converted to, and replaced by the License Agreement attached hereto as Appendix A.

In effect, Novamont was required to pay past royalties and to sign the so-called standard polypropylene license at its previously established rate.

### The Issues

Under the facts as found above certain issues remain for resolution.

1. Is Novamont entitled to MFL treatment with respect to licenses entered into from July 1971 to July 1, 1974, its period of infringement?

2. Does the Ziegler/Diamond Shamrock option agreement violate the Novamont MFL clause?

3. Does the undisclosed Ziegler/Diamond Shamrock agreement to treat any infringement payment as an additive down-payment violate the Novamont MFL clause?

4. Is Novamont entitled to any benefits which might have resulted from an accrual of royalties during the period of the Phillips action?

5. Does the Ziegler/Hercules agreement violate the Novamont MFL clause?

6. Was Novamont defrauded by SGK's failure to disclose to it the terms of the Ziegler/Hercules agreement?

7. Was Novamont defrauded by SGK's representation that the Hercules agree-

ment contemplated the application of the entire $1.6 million payment toward future royalties rather than the application of nearly half of that sum toward past due royalties that had been suspended?

### The Conclusions

### The Effect of the 1974 Ziegler/Novamont Agreement

■ The Ziegler/Novamont agreement of July 1, 1974 was entered into by powerful parties, ably represented. At issue is whether the agreement means what it says and restores Novamont to its 1967 position or whether Novamont is barred as an infringer from enforcing its MFL clause with respect to events occurring during the period of its infringement, which of course is the very period during which the Diamond Shamrock and Hercules agreements were entered into. I conclude the agreement means what it says and that Novamont is entitled to enforce its MFL clause with respect to events occurring during its period of infringement.

The very issue between the parties was the infringing conduct by Novamont, conduct that resulted from Novamont's own determination to take a chance on the invalidity or inapplicability of the patent after the lower court decision in *Phillips*. When the uncertainty created by that decision was removed by the 5th Circuit decision in 1973, Novamont was in an exposed position and ultimately paid up, dollar for dollar, the royalties that were due during its infringing period. It bargained for, paid for and got the restoration of its prior status.

Given the demonstrated skill of Novamont's counsel, it may well be that even at the time of the 1974 Ziegler/Novamont agreement, suspicions may have been harbored that there was more to the Diamond Shamrock and Hercules agreements than met the eye—a suspicion which turned out to be true, whatever the legal effect of that fact may be. Sprung, Ziegler's United States negotiator, certainly highly experienced and in command of the facts, knew as a participant all the facts relevant to the Diamond and Hercules agreements. Nonetheless, there is no evidence in this carefully presented and well documented record that the retroactivity provision of the Ziegler/Novamont agreement was intended to be anything other than what it purported to be. The clear language controls and Novamont is entitled to the benefits of its 1967 MFL clause, if any.

### The Ziegler/Diamond Shamrock Option Agreement

■ The Diamond Shamrock option agreement for co-polymers was concealed from Novamont. That concealment, however, did not violate Novamont's MFL clause, which required revelation only of actual license agreements containing royalty provisions that, in their entirety, were more favorable than those contained in the Novamont license agreement. The Diamond Shamrock option agreement was not such a license agreement. It was not a license agreement at all, but an option to create a license agreement. *See generally Plantation Key Developers, Inc. v. Colonial Mortgage Co.*, 589 F.2d 164 (5th Cir. 1979) (proffered contract underlying option agreement not binding contract until accepted); *1020 Park Ave., Inc. v. Raynor*, 97 Misc.2d 288, 411 N.Y.S.2d 172 (Civ.Ct.N.Y. Cnty.1978) (exercise of option converts offer into binding contract). As such, it did not fall within the purview of the MFL clause, and its disclosure was not required by that clause. Furthermore, because it was never exercised, it did not lead to the creation of a license agreement the disclosure of which might have been required.

Even if the option agreement is viewed not as a separate contract but as one component of Diamond Shamrock's license agreement, the conclusion stands that its disclosure was not mandated by the MFL clause. That is because the option agreement was not a *royalty* provision, and only royalty provisions were covered by the MFL clause. Therefore, even though the option agreement may well have been beneficial to Diamond Shamrock, it was not the type of provision which the MFL clause required the licensor to disclose.

Finally, since under its 1967 agreement Novamont had the right to produce co-polymers, the Diamond Shamrock option agreement was not more favorable than the agreement Novamont already had. For that reason, too, its concealment was not violative of Novamont's MFL clause.

### The Ziegler/Diamond Shamrock Additive Down Payment Agreement

■ There is no doubt that Ziegler concealed from Novamont the additive credit features of his 1970 contingent agreement and final 1974 settlement agreement with Diamond Shamrock. Those provisions were conveniently and deliberately withheld from Novamont, a withholding which SGK claims was justified by the line of cases holding that MFL provisions similar to those in the instant case do not apply to the settlement of infringement claims. See Searle Analytic, Inc. v. Ohio-Nuclear, Inc., 398 F.Supp. 229 (N.D.Ill.1975); Universal Oil Products Co. v. Vickers Petroleum Co., 41 Del. 238, 19 A.2d 727 (1941); Raytheon Mfg. Co. v. Radio Corporation of America, 286 Mass. 84, 190 N.E. 1 (1934). The policy behind such holdings appears to be to facilitate settlements by not compelling licensors to choose between 1) exacting from infringers royalty payments for the period of infringement equivalent to those paid during that same period by those holding licenses containing MFL clauses and 2) forfeiting the payments made during that period by those licensees. The wisdom of that policy is amply demonstrated by the facts here, which involve an important patent, of long and hotly contested validity, and multiple parties with competing interests, variously situated with respect to the patent throughout the period of conflict. During the pendency of the infringement action involving Phillips, Ziegler sought to achieve settlements in order to shore up his patent position, to minimize infringement, and to obtain down payments, presumably to assist in the necessary litigation. In these circumstances, it must be assumed that a commitment and cash on hand in 1970 and 1972 during the period of patent litigation were more valuable to Ziegler than the same

commitments and cash would have been after the validation of his position by the Fifth Circuit in 1973. At the same time, the competing manufacturers of polypropylene were forced to make judgments with respect to their positions vis-a-vis the patent and its holder: whether to infringe or settle, whether to make or withhold royalty payments, and so on. In such circumstances, the policy that withholds MFL treatment from arrangements regarding past infringement serves the valuable purpose of resolving conflict and encouraging settlement.

The difficult aspect of the 1974 Diamond Shamrock settlement for past infringement is that the device used takes the form of a conversion of liability for any past infringement into a down-payment credited towards future royalties. In that sense, the settlement not only looked to the past but also affected the future, a confusion made evident by this court's earlier rulings on the defendants' motion for summary judgment. See Studiengesellschaft Kohle mbH v. Novamont Corporation, 77 Civ. 4722 (RWS) (S.D.N.Y. Oct. 19, 1978). However, that fact alone does not suffice to trigger a departure from the rule established by precedent for the treatment of past infringements. Because the secret agreement between Diamond Shamrock and Ziegler related to the method by which a past infringement was to be resolved, and because the royalty terms themselves, as opposed to the method of payment, were made available to Novamont, the settlement agreement was not subject to nor violative of Novamont's MFL clause.

The important point here is that insofar as the arrangement looked to the past, it was not covered by the MFL clause, see Universal Oil Products, supra; Raytheon Mfg. Co., supra, and insofar as it pertained to the future in its provision for down-payments on future royalties, Novamont was offered a similar agreement, which it did not accept. Because the MFL clause was prospective only, that offer satisfied the MFL clause obligations of SGK. See Universal Oil, supra; Raytheon, supra.

In this regard, there would appear to be no reason to distinguish between the original down-payment agreement Ziegler reached with Diamond Shamrock in 1970 and the subsequent additive credit agreement which resolved the dispute about Diamond Shamrock's past infringement. Novamont was offered an agreement with the same royalty terms utilized in both of those Diamond Shamrock agreements, and it is equivalence of royalty terms that the MFL clause provides for.[6] The fact that one portion of those royalty payments was paid as part of a settlement of past infringement does not alter the essential fact: the nature of the royalty terms themselves.

In addition, Diamond Shamrock's application of payments covering past infringement toward future royalties did not entitle Novamont to receive credit toward future royalties for its own payments made during the period of Diamond Shamrock's infringement. That conclusion follows from the rulings in *Searle Analytic, Inc., supra,* and *Universal Oil Products Co., supra.* In *Searle Analytic,* the licensee, "Ohio," was protected by an MFL clause in all relevant respects indistinguishable from that present here. A subsequent agreement entered into between the licensor and another party forgave that party's past infringement. Ohio claimed that it was entitled to an abatement of the royalties it paid during the period of the subsequent licensee's forgiven infringement. The court ruled against Ohio, finding that the licensor had not forfeited its right to Ohio's royalty payments during the period of the third party's infringement by forgiving that infringement. A similar conclusion was reached in *Universal. See also, Rothstein v. Atlanta Paper Co.,* 321 F.2d 90 (5th Cir. 1963) (discussing "built-in-gap" between prior and subsequent licensees); *Raytheon Mfg. Co., supra.* As these cases indicate, Novamont was not entitled to a credit toward future royalties for the payments it made during the period of Diamond Shamrock's infringe-

ment, just as Ohio was not entitled to an abatement in *Searle Analytic.*

Finally, there is no evidence before me that a prepayment of future running royalties was a benefit to the licensee; given the cost of money during this period, a demonstration to that effect would be extremely difficult, if not impossible, and none was attempted here.

■ Another feature of the Diamond Shamrock agreement is claimed to violate Novamont's MFL clause, namely, the right granted Diamond Shamrock to accrue, rather than pay over, royalties during the period of the *Phillips* litigation. I agree that the failure to offer a comparable accrual right to Novamont constituted a violation of its MFL clause. SGK argues that it satisfied its MFL obligation by offering Novamont the literal terms of the Diamond Shamrock accrual provision. However, the proof at trial established that those terms were tailored to Diamond Shamrock's situation vis-a-vis Phillips and that they would not, if included in an SGK-Novamont agreement, have allowed Novamont to accrue royalties during the *Phillips* litigation. To accept SGK's argument that by offering these terms to Novamont, to whom they were useless, SGK satisfied its MFL obligations would be to ratify a procedure with the potential of vitiating MFL clauses altogether. If a licensor were able to evade bestowing more favorable royalty provisions contained in subsequent license agreements on prior licensees protected by MFL clauses through the simple expedient of designing royalty provisions that benefit only the subsequent licensee, then the licensor would possess the ability to sap MFL clauses of their substance and utility. I do not accept SGK's argument because it would lead to precisely that result. Novamont was entitled by virtue of its MFL clause and SGK's agreement with Diamond Shamrock to an agreement that allowed it to accrue royalties during the pending of the

---

**6.** The reference to "royalty terms" here means the rate at which royalties were to be assessed for future manufacture under the patent. In fact, the creditable downpayment made by Dia-

mond Shamrock in 1974 was twice as large as a payment calculated through application of those royalty terms to the manufacture during the infringement period would have been.

*Phillips* litigation, just as Diamond Shamrock was allowed to do. It was not offered such an agreement. It is therefore entitled to succeed on the portion of its counterclaim based on deprivation of the accrual right to the extent that it was harmed thereby.

The appropriate measure of damages on Novamont's counterclaim for this breach of the MFL clause is the $94,651 interest Novamont was required to pay on the royalties owed for the period of the *Phillips* litigation but withheld during that litigation. That is the measure because Diamond Shamrock was charged no interest on the royalties it accrued during that period.

### The Ziegler Hercules Agreement

The Ziegler/Hercules agreement was reached in the spring of 1972, as described above. Although SGK has consistently referred to the agreement as simply the conversion of existing running royalty obligations into a down-payment of $1.6 million, thereby seeking to invoke *Hazeltine Corporation v. Zenith Radio Corporation*, 100 F.2d 10 (7th Cir. 1938), *cert. denied*, 306 U.S. 656, 59 S.Ct. 646, 83 L.Ed. 1054 (1939), the agreement on its face does not so provide. As finally approved, the agreement divided the amounts to be paid into 770,000 for past infringement, $30,000 for entering into the agreement, and $800,000 as a down-payment in lieu of running royalties to be paid during the life of the '115 patent for production of polypropylene up to a capacity of 600 million pounds, with an additional royalty of 1% to be paid on sales in excess of 600 million pounds. As set forth above, this division of the amounts to be paid was arbitrary, made at Hercules' request and solely for its own tax purposes. I conclude that this division of the down-payment was not only arbitrary but artificial and did not represent the actual agreement of the parties. The actual agreement called for a full $1.6 million down-payment in the event that Ziegler was successful in the *Phillips* action, which down-payment was entirely directed toward future production, rather than partially directed toward past infringement. That finding does not lay this issue to rest, however, for the effect of the Novamont MFL clause in the light of the Hercules lump-sum payment agreement remains to be determined.

SGK rests in large measure on *Hazeltine, supra*. In *Hazeltine*, the Hazeltine Corporation ("Hazeltine") was the holder of patents covering certain radio applications. It entered into license agreements with various manufacturers of radios, including Zenith. Zenith's license agreement contained a "most favored licensee" clause, providing that Zenith was entitled to a royalty rate as low as that paid by any other licensee. The contract provided that royalties would be calculated at a given percentage of selling price. In lieu of paying such percentage royalties, Hazeltine licensees, including Zenith, could elect, at the beginning of any given year, to pay a lump sum of $150,000. Zenith argued that if any other licensee elected to pay such a lump sum in lieu of a percentage of sales, and at the end of the year it appeared that the licensee's royalty was lower than it would have been had it been calculated according to the percentage rate specified in Zenith's own license contract, then Zenith would be entitled to utilize the lower percentage rate allegedly reflected in the other licensee's lump-sum payment. The court rejected this argument, holding that Zenith had no right under its contract to convert the rate actually achieved by a licensee electing a lump-sum formula into a percentage rate applicable to Zenith's contract. The court found that a lump-sum payment represented an altogether different method of calculating royalties than that used in fixing a running royalty schedule and that an MFL clause does not entitle its holder to the security of the latter coupled with the potential benefits of the former. Hence, the court refused to allow Zenith to avoid the risks inherent in a lump-sum payment, yet enjoy its advantages should it turn out that Zenith would have fared better by choosing a lump-sum form of payment at the beginning of the year. The court concluded that the MFL clause was satisfied so long as the same lump-sum figure was offered to Ze-

nith. That offer had been made, and so the court concluded there was no MFL violation.

The essence of *Hazeltine* is that an MFL clause does not entitle its holder to a lump-sum down-payment option calculated using the same royalty rates as those effectively reflected in a lump sum accepted from a competitor. Applied to this case, its teaching would be that SGK satisfied its MFL obligation by disclosing the terms. of the Hercules agreement, thereby allowing Novamont to opt for a $1.6 million down-payment for 600 million pounds of annual production. Under *Hazeltine*, SGK went beyond the call of its MFL duty by offering Novamont a lump-sum payment option calculated according to the method employed by Ziegler in the Hercules negotiations, with royalty rates derived from the Novamont agreement.

■ If *Hazeltine* were the law of this Circuit, it would dictate victory for SGK on this portion of this lawsuit. However, the vitality of *Hazeltine* is questionable, for, though cited in several treatises, see, e. g., A. Deller, 4 *Deller's Walker on Patents*, 691 (2d ed. 1965), its holding has not been relied upon in this or any other circuit. Furthermore, I question the wisdom of the *Hazeltine* holding. *Hazeltine* appears to permit a licensor to evade the spirit of its MFL obligation whenever dealing with subsequent licensees with relatively large projected capacities. The obvious purpose of MFL treatment is to protect licensees shielded by MFL clauses against the granting of competitive advantages to subsequent licensees; the holding in *Hazeltine* appears to frustrate that purpose.[7] I therefore decline to rest on it alone. Rather, I find for SGK on the independent ground that Novamont's MFL clause did not entitle it to a lump-sum

payment option calculated using Hercules' royalty rates. I reach that conclusion on the basis of the terms of the MFL clause itself and the policy behind MFL treatment.

To begin with, the terms of Novamont's MFL clause, as quoted *supra,* p. 565, provided that Novamont would be entitled to substitute for its own agreement "all of the provisions" of any subsequent license agreement containing "royalty provisions that, when considered in their entirety, are more favorable than those specified [in the Novamont agreement]." There are two ways in which to interpret this clause as applied to the Hercules agreement. One way, that suggested by *Hazeltine*, is to say that "all of the provisions" refers to the precise terms of the Hercules agreement, that is, a paid-up license for 600 million pounds capacity for the price of $1.6 million. For the reasons set forth above, I decline to rely upon that interpretation, *Hazeltine* notwithstanding.

Alternatively, "all of the provisions" can mean all of the provisions pertaining to the method by which the lump-sum payment provided for in the Hercules agreement was calculated. This interpretation makes sense in light of the purpose of prospective MFL treatment. That purpose, as noted above, is to protect licensees shielded by MFL clauses against the granting of competitive advantages to subsequent licensees. However, the purpose is not to redress disadvantages vis-a-vis prior licensees; the holder of a prospective MFL clause enters into the agreement containing that clause with knowledge that it will not protect him from competitive advantages secured by prior licensees.

This method of calculation interpretation is consistent with the purpose of an MFL

---

**7.** A simple illustration demonstrates the problem. Under *Hazeltine*, if a licensor granted a license containing an MFL clause to a producer with a projected production capacity of 1,000 units using a royalty rate of $10 per 100 units of production, it could afterwards grant a license to another producer with a projected production capacity of 100,000 units for the lump sum of $1,000 without violating its MFL obligation. The MFL clause holder, that is, the

prior licensee, would gain nothing by opting for the lump sum payment, for its projected capacity is too small to gain any benefit from it. At the same time, the subsequent licensee would have the benefit of an effective royalty rate one tenth as large as that applied to the MFL holder, despite the fact that the subsequent licensee is one of those who, under the MFL clause, was not to be granted a competitive advantage over the MFL holder.

clause. In instances in which an agreement is entered into between the licensor and a new licensee, after the granting of an MFL clause to a third party, the most favored licensee would be entitled to a license agreement calculated utilizing all aspects of the method whereby the new license agreement was calculated, including the method whereby the royalty rate was chosen. In instances in which a prior licensee's agreement is modified or a novation is executed, the most favored licensee would similarly be entitled to opt for an agreement calculated through use of the same method. If the prior licensee's new contract were calculated through reference to provisions in its prior contract, including its own prior royalty rate, then the most favored licensee would similarly be entitled to a contract calculated through reference to the analogous provisions in its own prior contract, including its own prior royalty rate. Thus, its competitive position relative to prior licensees is preserved, and it bears no risk of being subjected to new competitive disadvantages from subsequent licensees. The purpose of the MFL clause is thereby satisfied.

Application of this "method of calculation" interpretation is complicated here, however, because, as I have already found, the written agreement does not accurately reflect the actual agreement between the parties in this regard. It is to that "actual" agreement, if indeed one exists, that it is necessary to refer in order to ascertain the effect of the MFL clause.

As previously discussed, two competing explanations were offered at trial with respect to the derivation of the Hercules lump-sum amount. Novamont contends that that amount reflects a forgiveness of royalties for the last three years of the patent term. SGK maintains that no future royalties were forgiven, but that the lump sum covered projected royalties to the end of the patent's life, with appropriate discounts for contingencies and present value.

As outlined above, there is evidence in support of both explanations. Novamont relies on a documentary history of the proposals and counter-proposals preceding the final negotiating session. SGK relies on the trial testimony of Dr. Martin and one page of handwritten notes said to be the record of Dr. Martin's and Sprung's calculations during the final negotiations. Unfortunately, the final figure itself, $1.6 million, provides no insight, for both methods of calculation yield that same result.

Dr. Martin's testimony is somewhat troublesome, because, though his trial testimony was firm and believable and indicated a high degree of conviction regarding the manner in which SGK calculated the $1.6 million figure, that testimony was weakened by his earlier deposition in which he claimed a failure of recollection on precisely that subject. He testified at trial that in the time between deposition and trial, he had reviewed documents and engaged in conversation with Sprung, and had thereby refreshed his recollection on the manner of calculation. I found Martin's testimony at trial credible, in that I found it to be an honest statement of his present belief regarding the events of nearly a decade ago. I cannot, however, make a determination that his testimony reflected an agreement between the parties at that time. The process of memory refreshment is a mystifying one, and there can be no certainty here that Dr. Martin actually recalled those long concluded calculations rather than merely believing that he did, the wish, perhaps, having become father to the recollection. In any case Martin's recollection simply confirms the use of what one of the Hercules participants termed the "negotiating tools" without achieving the degree of formality necessary to constitute an agreement between Ziegler and Hercules with respect to the calculation of the $1.6 million.

That uncertainty notwithstanding, I find SGK's theory a plausible one. On the other hand, Novamont's extrapolation from the documentary proof is also plausible, and its argument that the parties were unlikely to have abandoned the basis of their prior discussions in the final negotiating session has a certain ring of truth. In the final

analysis, however, I am unable to say on this record that the final agreement reflected a three-year forgiveness; indeed, I am unable to conclude that the parties on either side of the negotiating table ever agreed with each other on a method of calculation. It is entirely possible, and consistent with the record of this case, that only the final figure, and not the manner of reaching it, was the subject of a "meeting of the minds" between the parties. In short, there are two possible methods by which the lump-sum payment provided for in the Hercules agreement may have been calculated, and the evidence does not preponderate that either was agreed upon.

In order to have prevailed on its counterclaim under my view of the operation of the MFL clause, *Hazeltine* aside, Novamont would have had to establish by a preponderance of the evidence that a different method of calculation was used in calculating the Hercules lump sum than that used in calculating the offer made by Sprung to Novamont. In other words, had Novamont established that the Hercules agreement in fact contemplated a three year royalty-free ride, then it would be entitled to a determination that SGK's failure to offer Novamont a comparable grace period was a breach of its MFL clause. As indicated, however, the evidence does not preponderate that such a three-year forgiveness was embodied in the Hercules agreement or that a royalty rate was used which differed from Hercules pre-Novamont rate. Therefore, it cannot be said that SGK breached its MFL obligation.

SGK contends that it offered Novamont a lump-sum payment agreement with the lump sum calculated according to the method it says it used in arriving at the Hercules agreement, that is, the method applied a royalty rate derived from Novamont's pre-existing agreement to Novamont's project-ed production, with appropriate discounts for the present value of money and for contingencies. To establish its counterclaim, it was up to Novamont to prove by a preponderance of the evidence that a different method of calculation was used to reach the Hercules agreement than that used to arrive at the Novamont offer. Because it failed to carry that burden, Novamont does not succeed on its counterclaim based on the Hercules agreement.[8]

█ Finally, Novamont claims to have been defrauded by SGK in connection with the negotiations between it and SGK revolving around the Hercules agreement in two respects. First, Novamont contends that it was defrauded when SGK represented the Hercules agreement as providing for a payment of $1.6 million for a paid-up license when, in Novamont's view, "a large part of this sum went to pay past due royalties that had been suspended." Second, Novamont contends that it was defrauded when SGK failed to disclose the manner in which the Hercules agreement was calculated and failed to calculate the Novamont offer according to the same method. Neither contention succeeds.

The first claim fails because the $1.6 million lump-sum payment, as I concluded *supra* pp. 572–573, was in fact a payment for future use and not for past, suspended royalties. There was therefore no misrepresentation in SGK's characterization of it in this respect.[9]

The second claim fails because Novamont has not shown that SGK knowingly misrepresented the manner in which the Hercules lump-sum payment was calculated. As indicated above, the evidence does not preponderate that the Hercules agreement embodied a three-year royalty free ride. Indeed, the evidence does not preponderate that any one method of calculation was agreed upon in negotiating the Hercules

---

**8.** SGK contends that Novamont's rejection of the lump-sum agreement offered to it constituted a waiver of Novamont's MFL rights with respect to the Hercules agreement. Because of my conclusion that Novamont failed to carry its burden of proof on this portion of its counterclaim, I need not reach this issue.

**9.** The forgiveness of past infringement implicit in this arrangement is not violative of Novamont's MFL clause rights for the reasons set forth in the discussion of the Diamond Shamrock agreement, *supra*, pp. 570–571.

lump-sum payment. SGK's offer to Novamont was arrived at through a method of calculation which SGK claims is the same as that used in calculating the Hercules agreement, and because of the uncertainty regarding the manner in which the Hercules agreement was calculated, the record here does not support the contention that that claim is or was knowingly false. Therefore, Novamont does not succeed on its claim of fraud.

On the present record, it is not possible to fix damages because Novamont has failed to account for the period involved in this action. There will therefore be a conference on July 15, 1981 at 4:00 p. m. to discuss the appropriate procedure for going forward with proof of damages in accordance with this opinion prior to the entry of judgment.

IT IS SO ORDERED.