## HAZELTINE CORPORATION v. ZENITH RADIO CORPORATION.

### No. 6423.

Circuit Court of Appeals, Seventh Circuit.

Aug. 26, 1938.

Rehearing Denied Dec. 14, 1938.

Elwood Hansmann, and Edward H. McDermott, both of Chicago, Ill. (Paul Armitage and Henry T. Kilburn, both of New York City, of counsel), for appellant.

Irving Herriott, Henry M. Huxley, and W. Ward Smith, all of Chicago, Ill., for appellee.

Before MAJOR and TREANOR, Circuit Judges, and LINDLEY, District Judge.

TREANOR, Circuit Judge.

This is an appeal by the plaintiff-appellant, Hazeltine Corporation, from a decree of the United States District Court for the Northern District of Illinois, Eastern Division. Plaintiff began suit in the District Court by a bill of complaint which charged the defendant, Zenith Radio Corporation, with the infringement of one of plaintiff's patents. In addition to its answer the defendant filed a counter claim in which it pleaded that it had an equitable license under various letters patent, including the patent in question, but that the plaintiff had failed to issue to defendant a formal license in accordance with an agreement entered into by plaintiff and defendant through certain letters of January 31, 1934, February 1, 1934, and February 5, 1934; and that such agreement bound the plaintiff to execute and deliver to defendant a license under plaintiff's patents.

The decree of the District Court dismissed the plaintiff's bill of complaint and held that the defendant was equitably licensed as of July 1, 1934, to make and sell the apparatus covered by the patent, with the infringement of which the defendant was charged. The decree also granted to the defendant any damages which it had suffered by reason of the failure of the plaintiff to execute and deliver to the defendant a standard form of license agreement in accordance with the letters of January 31, February 1, and February 5, 1934. Plaintiff was ordered by mandatory injunction to execute and deliver its standard form of license agreement in specific performance of its undertaking as set forth in the letters of agreement.

The plaintiff, Hazeltine Corporation, is engaged in research for the development of radio apparatus and conducts a laboratory and owns numerous patents; and its business operation is the granting of licens-

.es under such patents to manufacturers and sellers of radio apparatus. Defendant, Zenith Radio Corporation, is engaged in the business of manufacturing and selling radio apparatus. And prior to the transactions directly involved in this case Hazeltine sued Zenith and others for alleged infringement of patent. A consent decree was entered wherein it was adjudicated that Zenith had infringed a certain patent owned by Hazeltine and that a perpetual injunction should issue restraining further infringement. Zenith paid Hazeltine the sum of $10,000 in settlement of plaintiff's claim for damages; and concurrently with the consent decree and settlement of the suit plaintiff executed and delivered the letter dated January 31, 1934. The correctness of the decision of the District Court depends upon the construction of this letter, which is as follows:

"This letter is written to accompany the present standard form of combined license under the patents of the Hazeltine Corporation and the Latour Corporation. As we have previously advised you, we contemplate that upon the expiration in June, 1934, of the outstanding licenses under these patents which have been granted for the manufacture, use and sale of broadcast radio receiving apparatus, Hazeltine Corporation and Latour Corporation will adopt a new standard form of license for the manufacture and sale of broadcast radio receiving apparatus and will renew said licenses only by issuing a standard form which is to be adopted.

"In consideration of your executing the present standard form of license with an expiration date of June 30, 1934, Hazeltine Corporation and Latour Corporation agree that they will renew said license by granting a license to your company in the standard form which is to be adopted, and agree that, regardless and irrespective of the volume of sales of radio apparatus made by Zenith Radio Corporation, the rate of royalty specified in such renewed license shall be as low as the lowest rate of royalty specified in any other license then or thereafter granted to others under the patents of the Hazeltine Corporation and the Latour Corporation for the manufacture and sale of broadcast radio receiving apparatus, and Hazeltine Corporation and Latour Corporation also agree that all other terms and conditions of the renewed license then granted to your company will be at least as favorable as the terms and conditions of any other license then or

thereafter granted to others under said patents of the Hazeltine Corporation and the Latour Corporation for the manufacture and sale of broadcast radio receiving apparatus."

Pursuant to the foregoing letter Hazeltine and Zenith executed plaintiff's then standard form license agreement, which had a termination date of June 30, 1934, and which recited that the licensee agree to pay to the licensor a royalty of 3% of the licensee's net sales, with an annual minimum royalty of $10,000.

After the expiration of the above license Hazeltine adopted a new standard form of license, which recited that the licensee agreed to pay licensor on each piece of licensed apparatus sold by licensee a royalty of either 1½% or 3% of licensee's selling price, depending on the class of apparatus sold; or at the option of the licensee an annual payment of $150,000 in lieu of the 1½% and 3% royalties. The license agreement provides that one desiring to take advantage of the lump sum royalty must give notice to licensor of such desire on or before July 1 of any year (except for the year beginning July 1, 1934, the notice could be given on September 1, 1934); the lump sum royalty privilege was for one year and subject to certain terms and conditions set forth in the license agreement.

Hazeltine offered the new standard form of license agreement on August 7, 1934, to take effect as of July 1, 1934, the previous standard license having expired June 30, 1934.

An exchange of correspondence between Hazeltine and Zenith followed. It was insisted by Zenith in its letters that the lump sum royalty provision would enable some licensees to obtain a lower rate of royalty than the rate which would be paid by Zenith under the standard form, unless Zenith should elect the lump sum royalty and do a volume of business as large as that of any other licensee. This contention presupposes that the statement in Hazeltine's letter of January 31, 1934, that the "rate of royalty specified in such renewed license shall be as low as the lowest rate of royalty specified in any other license * * *" was intended to limit the meaning of *rate of royalty* to a rate of per cent of selling price for the purpose of determining whether Zenith was receiving as low a rate of royalty as any other licensee. In short, if any licen-

see should elect to pay the lump sum and should do such a large business that the ratio between $150,000 and the total selling price of licensed apparatus would represent a percentage of the total selling price of less than 3%, then Zenith would be entitled to the advantage of the calculated rate of per cent for the purpose of computing the amount of its royalty payment.

Hazeltine notified Zenith that it considered its letter a rejection of the proffered standard form of license and further declared its unwillingness to grant defendant a license on the terms proposed by defendant. Hazeltine also notified defendant that its use of Hazeltine's patents on and subsequent to July 1, 1934, constituted infringement. And on May 18, 1936, plaintiff filed the instant suit in the District Court.

The substances of Zenith's case may be stated as follows:

(1) The letter of January 31, 1934, was an option contract, consideration for which had been fully furnished by Zenith.

(2) By the terms of such contract Hazeltine was obligated to execute and deliver to Zenith a license agreement which would grant to Zenith as low a percentage of royalty as any other licensee would obtain under its license agreement.

(3) As a consequence of the foregoing if any licensee should elect to pay the lump sum royalty of $150,000 a year, and if the $150,000 lump royalty represented a percentage less than 3% of the total sales of such licensee, then Zenith would be entitled to such rate of percent as its rate of royalty.

We shall first consider Hazeltine's contentions (1) that the terms of the letter of January 31, 1934, were too uncertain, indefinite and incomplete to be legally enforcible, and (2) that Zenith's letters amounted to a refusal to accept the new standard form of license provided for by the letter of January 31, 1934, and became in legal effect a counter offer.

The general statement that "An offer must be so definite in its terms, or require such definite terms in the acceptance, that the promises and performances to be rendered by each party are reasonably certain"[1] is, as stated by plaintiff, elementary law; but we are of the opinion that the promises and performances to be rendered by each of the parties in the instant case are reasonably certain. We are dealing with a standard of business certainty, not a standard of mathematical exactness or scientific precision, and it is not reasonable to believe that the interested parties were disturbed by any element of uncertainty in the letter of January 31, 1934. Both parties understood that the Hazeltine corporation would adopt a new standard form of license and that Hazeltine, as a matter of business expediency, intended to obligate itself to renew Zenith's license by granting to the latter a license in the standard form which was to be adopted; the parties also clearly understood that "regardless and irrespective of the volume of sales" made by Zenith corporation, the rate of royalty specified in such renewed license would be as low as the lowest rate of royalty specified in any other license which should be granted to any other licensee; and that all other terms and conditions of the renewed license would be at least as favorable as the terms and conditions of any other license granted to any other person under patents of Hazeltine. The new standard form was prepared and adopted for use in the trade, and we are not confronted by any questions that might have arisen if Hazeltine had failed to formulate and offer the new license to prospective licensees. By the formulation and adoption of the new form Hazeltine defined its obligations as a licensor under the option contract with Zenith. There is no suggestion by either party that the new form of license does not satisfy the standard of certainty which the law requires as a prerequisite to the incurring of contract obligations. If Hazeltine had not formulated and tendered its new standard form of license, and if Zenith were seeking relief in some form on the basis simply of the letter of January 31, 1934, it is obvious that it would be futile to contend that such letter constituted a license, or a contract for the issuance of a license which could be enforced in equity. But when the new standard form was adopted by Hazeltine it became a part of the option contract, and assuming for the moment that Zenith effectively exercised its option, Zenith's rights at the time of the trial were the same as if the new form had been physically incorporated in the letter of January, 31, 1934.

---

[1] Restatement of the Law of Contracts (1932) Sec. 32.

Hazeltine relies upon Weston Paper Mfg. Co. v. Downing Box Company[2] as authority for its contention that the alleged agreement in the instant case is legally unenforcible because of its uncertainty. In the Weston Case the vendor and vendee had entered into an agreement by the terms of which the vendor agreed to sell, and the vendee to buy, 900 tons of strawboard to be shipped as follows: "Seventy-five (75) tons per month from January 1, 1921, to December 31, 1921, both inclusive." The agreement specified that the price was to be fixed by the seller on or before 15 days prior to the beginning of each three months period. This court held that the agreement was unenforcible because of uncertainty as to price. But in the course of its discussion the court made the following comment: "Under these circumstances, had the vendor written to the defendant, and said: 'The contract which we have entered into is indefinite and uncertain, and therefore invalid. I now propose to make it definite and certain, by making you the same proposal as found in the written agreement, excepting only the price provision, which was heretofore indefinite and uncertain, I now fix at $90 per ton. Will you accept?'—and had the purchaser replied, 'I accept,' could the validity of such a contract have been questioned? Obviously not." In our opinion the formulation of the new form of license by Hazeltine and its offer of this form to Zenith as the standard form contemplated in the letter of January 31, 1934, created a situation which is analogous to the situation which was assumed in the foregoing comment from the opinion in the Weston Case.

It is important to note that the obligation which Zenith was seeking to enforce is not one to formulate and adopt a standard form of license, but the obligation to execute and deliver to Zenith the new license agreement which has been formulated by Hazeltine in accordance with the expectations of both parties as disclosed by the agreement of January 31, 1934, and which has been tendered to Zenith and, according to the contention of Zenith, accepted and executed by Zenith.

The case of Scott v. Moragues Lumber Company,[3] relied upon by the defendant, affords a strong analogy to the facts in the instant case. In that case one Scott was considering the purchase of a ship and an agreement was entered into between him and a lumber company by the terms of which the latter promised to charter the ship from Scott at a stated rental, and Scott promised to enter into a charter contract with the lumber company at the named rental if he should buy the ship from the then owner. Scott bought the ship but refused to carry out the charter agreement, contending that his promise to rent the ship depended upon his own voluntary act of buying it, and consequently, that his agreement with the lumber company was unenforcible since its performance depended upon his own free choice. It was held that he was bound to carry out the charter agreement. The court pointed out in its opinion that his free choice was to buy or not to buy; but that when he had purchased the ship he was not free to perform or not to perform his contract of charter.

In Hayes v. O'Brien[4] the Supreme Court of Illinois held that an option to purchase leased premises "upon such terms and at the same price per acre as any other person or purchaser might have offered therefor" was not so uncertain in its terms that it would not be enforced specifically at the suit of the lessee. The opinion of the court stated the governing principle to be this: "When the contract appoints the mode of determining the price, and the price is determined according to that mode, the contract becomes perfect and complete in all respects, as if it had been originally fixed in the writing * * *"

We conclude that the agreement as expressed in the letter of January 31 was sufficiently certain to entitle Zenith to a decree that it was equitably licensed as of July 1, 1934, and to mandatory injunction that Hazeltine execute and deliver to Zenith the new standard form of license which it had adopted, unless Zenith by its conduct had elected to reject its rights under the option contract.

Hazeltine contends that Zenith's letter of December 22, 1934, constituted a refusal to accept the standard form of license and was in legal effect a counter offer.

[2] 7 Cir., 293 F. 725, 728, 729.

[3] 1918, 202 Ala. 312, 80 So. 394.

[4] 149 Ill. 403, 37 N.E. 73, 75, 23 L.R. A. 555. See also McFarlane v. Williams, 107 Ill. 33; Grace v. Oakland Bldg. Association, 166 Ill. 637, 46 N.E. 1102; Cottingham v. National Church Ins. Co., 290 Ill. 26, 124 N.E. 822.

The letter was accompanied by two copies of the new standard license, which had been submitted to Zenith by Hazeltine and which were being returned to Hazeltine after being executed by Zenith.

We are of the opinion that Zenith's execution of the copies of the standard form constituted an acceptance of the standard form of license and that the accompanying letter did not destroy the effect of that acceptance. The letter pointed out how the lump sum provision, in the opinion of Zenith, might result in other licensees paying a lower rate of royalty than Zenith. But the letter also contained the following statement:

"By the execution of the license returned herewith, Zenith Radio Corporation does not waive any of its rights under the existing agreement with Hazeltine Corporation and Latour Corporation, by the terms of which Zenith Radio Corporation is guaranteed a rate of royalty as low as the lowest rate of royalty specified in any other license then or thereafter granted to others, irrespective of the volume of sales of radio apparatus by Zenith Radio Corporation. Further than this, it is understood that the execution of the license which is returned herewith is subject to the terms and conditions of this letter and the existing agreement above referred to, and that this letter shall become and be a part of the license as executed."

The foregoing language reasonably can be understood to mean that by accepting the standard form with its provisions respecting royalties Zenith was not relinquishing its right under the letter of January 31, 1934, to as low a rate of royalty as any licensee should receive as a result of electing to pay a lump sum royalty. The statement that "this letter shall become and be a part of the license as executed," when considered in connection with the full text of the letter, reasonably can be construed as amounting to no more than an unnecessary reservation of the right which is guaranteed by the agreement, that is, a right to have as low a rate of royalty as any other licensee.

Since Hazeltine had accepted valuable consideration from Zenith for the offer to enter into a license contract with Zenith, such offer was a contract; and by force of this contract Zenith had an irrevocable power to make the license contract. And since the offeror-offeree relationship was in law a contract relationship, definite evidence of an intention on Zenith's part to abandon its right under this contract should be required in order to justify a holding tht Zenith had given up its rights under the contract. In short, before we can so hold it must be clear that the letter of December 22 was intended to inform Hazeltine that Zenith's acceptance of the proposed contract license depended upon Hazeltine's assent to a change in, or addition to, the terms of the proffered license. Granting that Zenith was wrong in its contention respecting the possible effect of the lump sum royalty provision, yet Zenith was not asking that that provision, or any other provision, be changed either in the standard form generally or in the particular instrument which Zenith had executed. The letter of December 22, together with the fact of execution of the standard form, reasonably can be construed as indicating an acceptance of all the terms of the proffered license, but with an unnecessary protective declaration that by accepting the standard form license the licensee was not waiving its collateral rights provided for in the letter of agreement of January 31, 1934. And since Zenith's acceptance and execution of the standard license did not affect its collateral rights under the option contract, the reservations in the letter of acceptance did not impose, in fact or in law, any conditions upon the licensor, or change the terms of the license.

We are of the opinion that the District Court did not err in holding that Zenith was entitled to the standard form of license agreement from the plaintiff effective as of July 1, 1934.

The District Court not only decreed that Zenith was entitled to become a licensee under the standard form of license which was being issued by Hazeltine, but further decreed that such license should be impressed with the construction which Zenith placed upon the agreement of January 31, 1934. On the basis of the letter the court granted further equitable relief. In this respect we think the decree of the District Court was erroneous.

The standard form license provisions respecting rates of royalties are in substance as follows:

(1) 3% of the computed selling price of certain apparatus.

(2) 1½% of the computed selling price of certain other apparatus.

(3) $150,000 per annum in lieu of the percentage royalties above mentioned, to be elected in advance and paid quarterly in advance under specified conditions.

Clearly there is nothing in the form of the foregoing provisions which is inconsistent with the option letter of January 31, 1934. Under the standard form Zenith, equally with all other licensees, was entitled to elect to pay a lump sum royalty in lieu of a payment of 3% of the total selling price of certain classes of apparatus and 1½% of the total selling price of other classes of apparatus.

But Zenith contends that a licensee availing itself of the lump sum royalty provision may obtain, because of the volume of its sales, a lower rate of royalty than the defendant. The foregoing presupposes that "rate of royalty specified" must be construed to mean a specified rate of per cent of selling price royalty; and, also, that under the contract between Hazeltine and Zenith all lump sum royalties paid by licensees are in substance percentage of selling price royalties and must be converted by mathematical calculation into percentage of selling price royalties in order to determine whether or not Zenith's rate of royalty is as low as that of any other licensee.

The trial court accepted the foregoing proposition and construction and its conclusion of law No. 5 was in harmony therewith.[5]

Hazeltine insists that a specified amount per period of time for the use of a patented invention is a recognized and legitimate rate of royalty; and that the lump sum provision for payment of $150,000 a year for the use of its patent inventions was a specified rate of royalty within the meaning of that term as used in the letter of January 31, 1934. Also Hazeltine contends that a lump sum rate of royalty is not in substance a percentage of selling price royalty and that there are no common factors upon the basis of which one can be stated in terms of the other.

In view of the foregoing it is neces-sary first to determine whether the lump sum royalty of $150,000 per year in lieu of the 1½% and 3% royalties is a "specified rate of royalty" within the meaning of that phrase as used in the letter of January 31, 1934.

The language of the letter of January 31, 1934, does not purport to define "rate of royalty" nor to restrict Hazeltine to the adoption of any particular type or kind of "rate of royalty." As a general proposition "rate" does not connote rate of per cent, or percentage, but is usually used with the meaning "amount per unit." "Royalty," when used in connection with a license under a patent, means the compensation paid by the licensee to the licensor for the use of the licensor's patented invention.[6] This is substantially Webster's definition except that the latter adds "usually at a certain rate for each article manufactured, used, sold, or the like." The word "rate" itself does not define or designate the "unit." There have been various "units" used in license contracts under patents such as "device manufactured," "period of use," or "device sold." Royalty provisions frequently provide for the payment of a fixed amount per device manufactured, sold, sold or used, or for fixed payments per unit of time.

We cannot escape the conclusion that a provision in a patent-license contract which provides for the payment of a fixed sum of money per fixed period of time for the use of a patented invention states a "rate of royalty" within the generally understood and recognized meaning of that phrase. Obviously parties have the legal power to restrict the meaning of "rate of royalty" to percentage of selling price royalty; just as they might restrict it to an amount per device manufactured or sold. The custom of the trade might be such that when those of the trade use the words "rate of royalty" the meaning "percentage of selling price royalty" necessarily would be implied. But we find no special factors in the instant case, either in the form of the custom of the trade or in the conduct

---

[5] "The provision in the standard form of license agreement, whereby a licensee might, prior to the beginning of any license year, elect to pay a royalty of One Hundred Fifty Thousand Dollars ($150,-000) for that year, payable quarterly regardless of the volume of sales of such licensee for that year, made it possible for a licensee having a large volume of sales to pay a lower rate of royalty (percentage of selling price) than the rates of royalty specified in the standard form of license agreement as a percentage of selling price." Conclusion of Law No. 5.

[6] Words and Phrases, Royalty Vol. 6, Third Series.

of the parties to justify the conclusion that the term "rate of royalty," as used in the option agreement, was limited to the meaning of percentage of selling price royalty. And we are of the opinion that the provision for the lump sum royalty of $150,000 a year is a specified rate of royalty within the meaning of the term "rate of royalty" used in the option contract, although it is a period rate of royalty as distinguished from the percentage of selling price rate of royalty.

Zenith enumerates several circumstances for the purpose of throwing light on the meaning of the restrictive terms of the letter of January 31, 1934. It seems reasonably clear from the circumstances recited by Zenith that on or about January 31, 1934, Hazeltine was contemplating the abandonment of the practice of issuing different forms of licenses and intended to adopt a standard form which would cover all of its patents. But the letter of January 31, 1934, does not set out a single provision for the contemplated standard form. It contains no classification of patented articles for the purpose of applying rates of royalty and does not restrict Hazeltine in its choice of types of rates of royalty. Zenith did not have a right under the option contract that Hazeltine not include in the proposed standard form graduated rates of per cent varying according to volume of sales. The whole purpose of the restrictive clause is accomplished if Zenith, regardless and irrespective of the volume of its sales, in fact does receive as low a rate of royalty as any other licensee. For example if the standard form had included graduated rates of 1½%, 2%, 2½%, and 3%, the rates decreasing as the volume of sales increases, Zenith would have been entitled to the 1½% rate of royalty regardless and irrespective of the volume of sales by Zenith. And if, under the form which was adopted, Hazeltine had issued a license to some licensee calling for lesser rates than the 1½% and 3% rates, Zenith would have been entitled to the lesser rates. Also, if Hazeltine had granted a license under the present standard form in which the lump sum royalty had been fixed at $50,000 a year, Zenith would have been entitled to the privilege of electing to take such lump sum royalty in lieu of the percentage of selling price rates of royalty.

Assuming that a fixed amount per period of time is a rate of royalty within the meaning of the option agreement, and that Zenith's rights under that agreement are not violated by its inclusion in the standard form, it would seem to follow that in order to determine whether Zenith is enjoying as low a rate of royalty as any other licensee the comparison, in the case of a licensee who has elected to pay a lump sum royalty per year, must be between the amount of the lump sum rate of royalty paid by such other licensee and the corresponding lump sum rate in Zenith's license. And clearly the foregoing comparison is the proper one unless a lump sum rate of royalty is in substance the same as, and is merely a substitute for, a rate of per cent of selling price royalty, differing from it only in form.

Factually considered, a rate of royalty which is a fixed amount per period of time, is not in substance the same as a rate of per cent of selling price royalty. To assume that it is the same is to disregard the reality, and materiality, of elements of substantial value which are not considered if the fixed amount is treated as a percentage, or rate of per cent, of the total selling price of apparatus for a fixed period of time. The licensee which elects to pay the lump sum rate per period of time is freed from the necessity of disclosing its business affairs to licensor by monthly reports required of licensees which do not elect the lump sum rate; and this advantage, although incapable of being stated in terms of dollars, might be considered by the licensee of great value in the conduct of its business, which both parties agree is a highly competitive one. Also the licensee is not subject to regular audit of its accounts for royalty purposes by licensor and it is not necessary for such a licensee to keep its books or records so as to distinguish the computed sales value of such apparatus from his other sales. Also, by the terms of the lump sum royalty provision the licensee has certain advantages in connection with its sales to or through affiliated corporations. On the other hand from the standpoint of the licensor there are benefits which are obviously of great business value. The risk of unexpected shrinkage of licensee's sales is shifted from the licensor to the licensee. In addition to the advantage of earlier use of the royalty payments, the assurance to the licensor of fixed sums of royalty payable in quarterly installments in advance supplies an element of financial stability to

licensor which is real and certainly of great business value; yet all the foregoing are ignored in a mathematical evaluation of the lump sum royalty license in terms of percentage of the total selling price.

In the case of rate of per cent of selling price royalty three elements are material and have a fixed relation,—the rate of per cent, the selling price, and the royalty payment, the latter being a product of the other two. The relationship is fixed by the terms of the royalty agreement, and the percentage relationship of the royalty payment to the total selling price is predetermined by the fixed rate of per cent. In the case of the rate of royalty measured by a fixed sum per period of time the fixed sum, which is the royalty payment for the period, bears no fixed predetermined relation to a rate of per cent of the selling price. The fixed sum is arrived at by evaluating business advantages and disadvantages and not by a mathematical computation in accordance with an agreed formula. Since the amount per period is agreed upon before the period begins, and is payable regardless of the amount of the selling price for the period, there is no factual basis for insisting that such amount is a percentage of the total selling price for the period and that it is, therefore, convertable into a rate of per cent of selling price royalty.

In view of the vital and significant differences between a fixed sum per period rate of royalty and a percentage of selling price rate of royalty we are of the opinion that the two rates of royalty are substantially different types and that there is no basis in fact for the conversion of a lump sum rate of royalty into a rate of per cent of selling price royalty. The former is a true alternative to the latter and must be so treated in determining the rights of Hazeltine and Zenith in respect to royalty provisions under the option contract.

It follows that Zenith's right to have a specified rate of royalty in its license as low as that specified in any other license does not entitle it to have the rate of per cent factor of its percentage of selling price royalty numerically equal to a rate of per cent arbitrarily obtained by stating a ratio between $150,000 and the largest total selling price of apparatus for a year of any licensee who has elected the $150,000 per year rate of royalty.

We conclude that the District Court did not err in holding that there was an enforcible option contract and that Zenith was entitled to receive the standard form of license agreement from the plaintiff effective as of July 1, 1934, as a licensee under the standard license. But in holding that the license should be impressed with the construction that Zenith placed upon the agreement of January 31, 1934, and in granting further relief upon the basis of that holding the trial court was in error. In accordance with the foregoing the judgment of the District Court must be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

The judgment of the District Court is reversed.