### STUDIENGESELLSCHAFT KOHLE m.b.H., Plaintiff-Appellee-Cross-Appellant,

v.

### NOVAMONT CORPORATION nna., U.S.S. Novamont Incorporated, Defendant-Appellant-Cross-Appellee.

Nos. 397, 398, Dockets 82–7143, 82–7163.

United States Court of Appeals, Second Circuit.

Argued Oct. 13, 1982.

Decided March 28, 1983.

Granville M. Pine, New York City (Harry C. Marcus, Christopher A. Hughes, Morgan, Finnegan, Pine, Foley & Lee, New York City, William L. Krayer, Pittsburgh, Pa., of counsel), for defendant-appellant-cross-appellee.

Arnold Sprung, New York City (Nathaniel D. Kramer, Sprung Horn Kramer & Woods, New York City, of counsel), for plaintiff-appellee-cross-appellant.

Before MESKILL, PIERCE and FAIRCHILD *, Circuit Judges.

FAIRCHILD, Circuit Judge.

These appeals involve the interpretation and application of a "most favored licensee" (MFL) clause in a patent license agreement. Studiengesellschaft Kohle m.b.H.(SGK), the owner of the patent, sued Novamont Corporation to recover royalties due under a license agreement dated July 1, 1974. Novamont counterclaimed, claiming breaches of the MFL clause in the previous license agreement between the parties dated January 1, 1967, and fraud in the negotiation of the 1974 agreement. The facts appear in detail in the opinion and findings of the district court, *Studiengesellschaft Kohle v. Novamont Corp.*, 518 F.Supp. 557 (S.D.N.Y. 1981).[1]

In the 1967 agreement, Ziegler, the original patentee, granted Novamont a non-exclusive license to produce certain polymers of propylene under United States Patent No. 3,113,115 (the '115 patent). Thereafter Ziegler brought action charging Phillips Petroleum Company with infringement. On June 23, 1971, the district court found no infringement.[2] Presumably because of the district court judgment, Novamont gave notice July 9, 1971 that it would discontinue payment of royalties. On March 24, 1972 Ziegler gave notice of cancellation of Novamont's license.

On July 1, 1974, after decision on appeal reversing the district court judgment, upholding the validity of the patent, and finding infringement, Novamont and SGK, Ziegler's successor, reached agreement (*see* 518 F.Supp. at 568), creating the new license agreement sued upon here by SGK and providing that the 1967 agreement would remain in full force and effect notwithstanding notice of termination and that Novamont would pay all past due royalties under the 1967 agreement, with interest. *See* 518 F.Supp. at 568.

The district court concluded, 518 F.Supp. at 569, that the 1974 agreement restored the position of Novamont under the 1967 agreement and that it could enforce its MFL clause with respect to events during its period of alleged infringement. We examine the interim events as consistently as possible with the continued vitality of the 1967 agreement.

The 1967 MFL clause, Article IX, paragraph A.1, imposed a duty upon Ziegler promptly to furnish Novamont with the full text of the royalty provisions of any license granted by Ziegler under the '115 patent if such royalty provisions, considered in their entirety, are more favorable than those in the 1967 Novamont Agreement. Paragraph A.2 gave Novamont the right "upon written request within ninety (90) days after receipt of the aforesaid full text of such other license from Licensor, to substitute for the

---

* Honorable Thomas E. Fairchild, United States Senior Circuit Judge for the Seventh Circuit, sitting by designation.

1. Jurisdiction is founded on diversity. All parties appear to have assumed that New York law controls substantive questions.

2. Ziegler was successful on appeal in 1973. *Ziegler v. Phillips Petroleum Company,* 483 F.2d 858 (5th Cir.), *cert. denied,* 414 U.S. 1079, 94 S.Ct. 597, 38 L.Ed.2d 485 (1973).

entirety of this Agreement all of the provisions of such other license." [3] .

On July 9, 1970 Ziegler granted a license to Diamond Shamrock Chemical Company (Diamond). One of the principal controversies upon appeal is whether a simultaneous, undisclosed agreement between Ziegler and Diamond concerning past infringement was required to be disclosed, and included in a substitute agreement between Ziegler and Novamont if Novamont so elected. A second, though minor, controversy is whether another undisclosed agreement giving Diamond an option to expand its license to include copolymers of propylene was subject to similar requirements. A third controversy is whether Novamont was and is entitled to the benefit of a provision for accrual of royalties similar to the accrual permitted to Diamond in its 1970 agreement with Ziegler.

On April 26, 1972 Ziegler made a new agreement with Hercules Powder Company, amending previous license agreements and granting "a fully paid-up immunity from suit" until the expiration of the '115 patent. A fourth controversy is whether Novamont was entitled to a pre-paid license computed on a similar basis but tailored to a much smaller amount of production.

Finally, Novamont asserts misrepresentation and nondisclosure concerning these agreements with the other parties, amounting to fraud.

## I. The Undisclosed Agreement With Diamond Concerning Past Infringement

Ziegler did not initiate disclosure to Novamont of the 1970 agreement with Diamond. Only in part were the royalty provisions more favorable than Novamont's. The royalty rates in the Diamond agreement were lower than those in the 1967 Novamont agreement. On the other hand the Diamond agreement required a $200,000 down payment, did not permit the deduction of royalty payments to third parties, and granted no right to suspend royalty payments if infringers were not prosecuted.[4] In any event, Novamont learned about the Ziegler-Diamond agreement, demanded to be informed, and Ziegler, on October 30, 1970 supplied Novamont with the document which granted the license to Diamond. Novamont did not request substitution under paragraph A.2 of the MFL clause. Ziegler also disclosed a part of a separate letter, although it did not disclose the paragraph which agreed that in the event of recovery by Ziegler for Diamond's past infringement "such recovery shall additively be credited to the down-payment made in accordance with Paragraph III of the license agreement in the same manner as if the same had initially constituted part of the down-payment actually made, and shall be credited against royalties as provided in the license." 518 F.Supp. at 566. Paragraph III(a) required Diamond to pay $100,000 within 30 days, $50,000 more within one year, and $50,000 more within two years. The entire $200,000 was non-returnable except that it could be credited against royalties up to 50% of the royalties in any one year.

Novamont contends that the undisclosed 1970 paragraph was a royalty provision because it should be viewed as providing for a reduction in royalty. In any event, says Novamont, the undisclosed paragraph must be deemed part of the licensing agreement, and since the royalty provisions as a whole were more favorable, the MFL clause entitled Novamont to an agreement which included the undisclosed paragraph. Obvious-

---

3. The full text of the MFL clause is set forth in 518 F.Supp. at 565.

4. Because of our conclusion, consistent with that of the district court, that Novamont was entitled by its MFL clause to the benefit of an Accrual of Royalties provision similar to that contained in the 1970 Diamond licensing agreement, we conclude that the royalty provisions of the Diamond agreement, considered in their

entirety, are more favorable than those in the 1967 Novamont agreement. It follows that the MFL Clause required disclosure of the royalty provisions even though some of the provisions were less favorable. The same conclusion is implicit in the district court opinion previously cited, 518 F.Supp. at 571–72, and was made explicit in an unpublished opinion denying SGK's post-trial motions.

ly the undisclosed paragraph was not likely to be significant until the final outcome of the *Phillips* litigation over the '115 patent, but on May 6, 1974, after final decision in the *Phillips* case, SGK released Diamond from liability for infringement before July 1, 1970 in return for a payment of $750,000, credited as agreed. The terms of the 1974 settlement were not disclosed to Novamont.

█ It is clear that the terms of the undisclosed paragraph, taken literally, could not have benefited Novamont because Novamont had not then been an infringer. To be of benefit to Novamont the MFL clause would have to be so broadly construed as to call for modification in addition to substitution of the terms of the new agreement. Novamont evidently reasons that the MFL clause must be construed so as to entitle it to enjoy a credit against royalties equivalent in substance to the credit given Diamond for the sums paid for infringement. Novamont argues that the equivalent credit would be the amount paid by Diamond, $750,000, or at least the aggregate royalty Novamont had paid during the period Diamond had been infringing, some $465,000.

SGK contends that Ziegler's agreement in 1970 to apply the amount recovered for infringement to royalties (as well as the acceptance of $750,000 in settlement for infringement) relates to past infringement, and is not a royalty provision of the new license agreement. SGK emphasizes that Ziegler did not wholly forgive the past infringement because the interest cost to Diamond of the $750,000 advance payment was substantial (allegedly about $354,000). But SGK contends that whatever discount Ziegler afforded Diamond in the settlement of claims for infringement was irrelevant to the MFL clause.

The district court decided this issue in favor of SGK, correctly, we think.

Other cases have involved a similar tension between treatment of an earlier licensee, who was entitled to the protection of an MFL clause, and a competitor who takes a license later, after a period of infringing activity. Arguably, parallel treatment would require not only that royalty terms be the same from the grant of the second license forward, but that the licensor must insist upon an exaction from the later licensee for past infringement which is equivalent to the royalty terms governing the earlier licensee during the same period, or must make a refund to the earlier licensee.

MFL clauses do not seem to have been drawn so as to compel that degree of equivalency and the courts which have dealt with the situation have declined to interpret the clauses with that breadth. *Raytheon Mfg. Co. v. Radio Corporation of America*, 286 Mass. 84, 190 N.E. 1, 5 (1934); *Universal Oil Products Co. v. Vickers Petroleum Co.*, 41 Del. 238, 19 A.2d 727, 729 (1941); *Rothstein v. Atlanta Paper Co.*, 321 F.2d 90, 96 (5th Cir.1963); *Searle Analytic, Inc. v. Ohio-Nuclear, Inc.*, 398 F.Supp. 229 (N.D.Ill.1975).[5]

The district court relied on these decisions, and we agree.

*II. The Undisclosed Copolymer Option*

█ Simultaneously with the 1970 license agreement and the undisclosed agreement concerning past infringement, Ziegler and Diamond made a separate Option Agreement. Diamond paid $20,000 on execution of the Option Agreement. The agreement gave Diamond the right upon payment of an additional $30,000, to have the license amended to include manufacture, use and sale of certain propylene copolymers, subject to the same obligation to pay royalties. Both payments were non-returnable except that they would be credited against royalties.

The Option Agreement was not disclosed to Novamont. The option was never exercised by Diamond. Novamont already had the right to produce the copolymers under its 1967 agreement.

---

5. Novamont cites *Shatterproof Glass Corp. v. Libbey-Owens-Ford Co.*, 482 F.2d 317, 321 (6th Cir.1973), *cert. denied*, 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974). The court determined under the particular facts of that case that the release from claims of past infringement "was in effect a settlement by payment of just compensation for previous use of the patent" and had the effect of a retroactive license. We are not similarly persuaded here.

Novamont devotes little of its appellate argument to its claim that nondisclosure of the Option Agreement violated its MFL clause. We think the district court correctly denied this claim. 518 F.Supp. at 569.

### III. The 1970 Diamond Provision for Accrual of Royalties

The 1970 licensing agreement between Ziegler and Diamond contained a paragraph entitled "Accrual of Royalties," which provided as follows:

Licensee may hold and accrue royalties without forwarding the same to Ziegler during any period during which Ziegler is engaged in a suit for patent infringement involving the process utilized by Licensee and being defended by a party under a contractual obligation to hold Licensee harmless. Licensee, however, shall continue to account to Ziegler during such period of accrual and promptly upon termination of such suit shall pay accrued royalties to Ziegler, after deduction of any applicable credits, if, as a result of such suit, it is adjudged that Licensee's process infringes any valid claim of a patent owned by Ziegler and litigated in said suit, or if Licensee does not cancel this License as provided hereinafter. If, as a result of such suit, it is not adjudged that Licensee's process infringes any valid claim of a patent owned by Ziegler and litigated in said suit, Licensee, may by written notice, advise Ziegler of cancellation of this License. Upon such cancellation, Licensee shall be subject to any action in law or equity which would have been or is available to Ziegler in absence of this License, including action for past infringement during the period that royalties were not paid. Licensee will have the benefits of any settlement reached by and between Ziegler and any third party contractually obligated to hold Licensee harmless.

The first sentence causes the Accrual of Royalties provision to apply to Diamond during the pendency of the *Phillips* litigation because Phillips had agreed to hold Diamond harmless. If the identical provi-

sion were included in a Novamont license, it would not apply to and benefit Novamont. Hence SGK claims that the Accrual of Royalties provision is irrelevant to the operation of Novamont's MFL Clause.

The district court reasoned, however, that giving literal effect to the tailoring in this fashion of a beneficial royalty provision so that it would not benefit a licensee who is entitled to the protection of an MFL clause would be an evasion of the intention of the parties to the clause. 518 F.Supp. at 571. We agree.

We note SGK's argument that Diamond had little incentive to take a license so long as it enjoyed the protection of the *Phillips* hold-harmless agreement. SGK may well have been correct that the Accrual of Royalties provision was necessary in order to obtain Diamond's agreement. That proposition, however, is beside the point in determining the proper impact of the MFL clause. It is likely to be generally true that a licensor's grant of more favorable terms is supported by a sound business reason, but the benefit of more favorable terms is exactly what the person whose license includes an MFL clause has bargained for and to which he is entitled.

The purpose of the MFL clause was to protect Novamont from a competitive disadvantage resulting from more favorable terms granted to another licensee. *Prestole Corporation v. Tinnerman Products, Inc.,* 271 F.2d 146, 152 (6th Cir.1959). Limitation to Diamond of the right to accrue and delay payment of royalties during the infringement litigation would give Diamond a competitive advantage over Novamont. The fact that Diamond would have been held harmless if it continued to infringe rather than take a license is not germane to any purpose of the MFL clause. In a sense the limiting language helps identify the *Phillips* litigation as the suit the parties had in mind, but for any other purpose the MFL clause requires the limiting language to be disregarded. We think Novamont's MFL clause entitled it to substitute the entire Diamond license agreement, including a right to accrue royalties under the provi-

sion, as long as the *Phillips* litigation continued.

■ We are more troubled, however, by Novamont's failure to make a written request for substitution of all the provisions of the Diamond license within ninety days after being supplied with its provisions on October 30, 1970.

Novamont made no such written request until August 26, 1977, shortly before SGK brought this action for unpaid royalties under the 1974 agreement. Novamont had then learned of the undisclosed agreements and its counsel wrote SGK's counsel adopting the provisions of the Diamond license, including the undisclosed agreements. Even in that letter there was no specific reference to a claim that Novamont was entitled to enjoy the benefit of the Accrual of Royalties provision.

The district court, however, found that at a meeting on November 6, 1970, Ziegler's representatives refused to grant Novamont the right to accrue, rather than pay, the royalties due during the period of the *Phillips* litigation. 518 F.Supp. at 566. Addressing the point in an unpublished opinion on post-trial motions, the court said, in part, "Novamont did attempt to secure the right to accrue during its negotiations with Ziegler. Based on the response it received during those negotiations, Novamont could reasonably have concluded that the submission of a formal written request would have been an exercise in futility."

For evidence on the point, the parties have cited two memoranda from the Novamont side.

One refers to the November 6 conference. It lists provisions of the Diamond agreement, some less favorable than Novamont's existing license, and some more favorable, including "the right not to pay" during the

infringement litigation. The Novamont position is stated: "Novamont wants a new agreement assuring it some benefits comparable to those given by the new Ziegler/Diamond Agreement." The Ziegler position is stated: "Prof. Ziegler's representatives contested such a right of Novamont. They were willing to allow Novamont to get the lower rates existing in the Diamond Agreement, but with the obligation to continue royalty payments."

The second memorandum is dated November 13, 1970 and appears to be a report on a "recent conference." It contains a reference to the provision for accrual: "The present contract offered to Diamond is tailored to Diamond, since it provides that there will be no payments as long as there is another company, holding the licensee harmless. The attitude of the Germans seemed inflexible."

The proof is less than clear that Novamont offered to take all the other provisions of the Diamond agreement, favorable and unfavorable, if it could have the accrual right. Nevertheless, we might well consider the district court finding not clearly erroneous if the matter stopped there.

There is, however, a further question, whether Novamont's claim to be entitled to the Diamond license provisions, including accrual, survived the July 1, 1974 agreement between Novamont and SGK. We conclude that it did not.[6]

SGK claimed that the July 1, 1974 agreement constituted an accord and satisfaction. In the unpublished opinion on post-trial motions, the district court stated that SGK had not carried its burden. "There is no evidence in the record of any express statement by either of the parties, either during the negotiations leading up to the 1974 agreement, at the time it was entered into, or in the agreement itself, that the agree-

---

**6.** SGK contends that because the counterclaim was filed October 24, 1977, the claim for the benefit of the Accrual provision was in any event barred by the six year statute of limitations. Novamont asserts that certain events tolled the running of the statute. The district court was under the impression that although SGK had pleaded the statute of limitations, SGK had abandoned that defense "in its pre-trial order." On appeal SGK cites language from the order which appears to preserve all issues raised by the pleadings, and Novamont has cited no provision indicating abandonment. In view of our disposition of this claim, we do not reach the limitations issue.

ment was intended to constitute an accord and satisfaction."

The agreement, 518 F.Supp. at 568, did provide that it was made "in order to settle the differences between the parties." It is true that in its recitation of disagreements there was no mention of dispute over Novamont's right to substitute the provisions of the 1970 Diamond license. It did provide that the 1967 Novamont Agreement "remains in full force and effect" and that Novamont shall immediately account for and pay, with 10% interest, all past due royalties under the 1967 agreement. These agreements are flatly inconsistent with any claim that Novamont's royalty obligations were governed by the Diamond Agreement. The agreement to pay interest was completely at war with any application to Novamont of the accrual provisions. In our view the parties' intent to merge those claims in the settlement was so clear that some express reservation of them would have been necessary to avoid that result.

The district court erred in awarding an offset to Novamont based on the accrual provisions.

### IV. The 1972 Hercules Pre-Paid License

Ziegler had licensed Hercules in 1954, and their agreement had been amended in 1962 and 1964. 518 F.Supp. at 562. It provided for "running" royalties as did Novamont's, i.e., rates applied to amounts of sales. The Hercules rates were somewhat lower than Novamont's, but this was irrelevant with respect to Novamont's MFL clause because the Hercules license existed before the 1967 Novamont license, and the MFL clause applied only to licenses granted during the life of the agreement.

As already noted there came to be alleged infringement of the '115 patent by Phillips and others. On that account Hercules suspended royalty payments as of April 30, 1970. It claimed the right to do so under a provision of its license.

On April 26, 1972, Ziegler and Hercules reached a new agreement, 518 F.Supp. at 563. Paragraph 5 granted Hercules a "fully paid-up immunity from suit until December 3, 1980." The "immunity from suit" has been treated as the equivalent of a license extending to the expiration of the '115 patent. The license was pre-paid for a quantity of 600 million pounds per year sales, and a 1% royalty was to be paid on any excess. Other provisions required Hercules to make immediate non-refundable payments totalling $800,000, and an additional payment of $800,000, with interest from May 1, 1972, contingent upon a favorable decision on the validity of the '115 patent in the Phillips litigation.

Literally Paragraph 1 called for immediate payment of $770,000 in settlement of unpaid royalties from April 1, 1970 through 1972. Paragraph 2 called for immediate payment of $30,000 plus the contingent $800,000 for immunity from suit after 1972. The district court found, however, that the division was artificial, made for the tax purposes of Hercules and did not represent the actual agreement. "The actual agreement called for a full $1.6 million downpayment in the event that Ziegler was successful in the Phillips action, which downpayment was entirely directed toward future production, rather than partially directed toward past infringement." 518 F.Supp. at 572.

On appeal, Novamont contends that the $770,000 represented a total of Hercules' suspended royalties from April 1, 1970 to December 31, 1971, plus the then present value of Hercules' expected royalty for the year 1972, rounded off by a discount of .22%, and that the $830,000 represented the then present value of Hercules' expected royalty for the years from 1973 through 1980, but reduced by a very substantial discount of 55.71%.

Novamont argues that its MFL clause entitled it in 1972 to a pre-paid license covering its desired production of 160 million pounds per year. The lump sum pre-paying 1972 to 1980 would be computed by employing Novamont's (or as it says, Diamond's) royalty rates, sales of 160 million pounds each year, and the same discounts used in the Hercules computation. Unpaid royal-

ties since 1971 would be treated in a similar manner to Hercules' suspended royalties. Presumably the total lump sum would have been divided into a required payment and a contingent payment, although by hindsight we know that the contingency was fulfilled. In other words, Novamont contends its MFL clause gave it the right to a "customized" pre-paid license, with a lump sum royalty equivalent to the Hercules lump sum royalty, except for the difference in production. It now claims to be entitled to an adjustment which would put it in the same position as if it had made an agreement on that basis in 1972.

SGK points out that Novamont pursued a different theory at trial, and did not urge the significance of the $770,000 figure in Paragraph 1 of the Hercules agreement. Indeed Novamont proposed a finding, similar to the district court's, that the "$770,000 was, for tax purposes, attributed to payment of royalties from April 1, 1970 to December 31, 1972." In its amended complaint, Novamont had alleged that the Hercules agreement was a paid-up license for $1.6 million. Unlike the district court findings, and unlike its present theory, it proposed a finding that the $1.6 million lump sum represented 75% of Hercules' suspended royalties, plus approximately 75% of the projected royalties through 1977, according Hercules free royalty for the last three years of the life of the patent.

As we understand the SGK version, it was that Hercules prepared a projection of sales, based on plant expansion and increased production. Price trends were projected. There was a reduction of approximately 20% for contingencies in the course of planned plant expansion. If and when sales exceeded 600 million pounds in any year, royalty on the excess would be 1%. The $1.6 million represented the 1972 present value of royalties at the previous Hercules rate on the estimated future sales up to 600 million pounds per year.

■ The district court found that Novamont failed to establish that a three year forgiveness was embodied in the agreement or that a method was used to reach the

Hercules agreement different from that used in an offer made to Novamont. 518 F.Supp. at 574. If essential for the purpose of this decision, we are unable to say that the finding is clearly erroneous.

We conclude, however, that Novamont's MFL clause did not entitle Novamont to this analysis.

If we assume Novamont was right in either the analysis on which it proceeded at trial, or the one which it argues here, Novamont's position would rest upon an untenably broad construction of its MFL clause, albeit a construction which the district court seemed willing to entertain. 518 F.Supp. at 573–74.

Moreover on the facts before us Novamont's success would require a retrospective hypothetical reconstruction which presents serious difficulties. At the time of the 1972 Hercules agreement, Hercules had not been paying royalties for two years, claiming a contractual right to suspend because of infringement by others. Hercules was willing to pay $800,000 down in order to secure a pre-paid license covering 600 million pounds annually, promising an additional $800,000 if the *Phillips* litigation turned out so as to sustain validity. Hercules did not know what that outcome might be, but its willingness to pay $800,000 down must have been affected by its judgment of the probabilities in the *Phillips* case.

Novamont had not paid royalties for most of one year. Ziegler had given notice of termination and viewed Novamont as an infringer. Novamont did not desire a license covering more than 120 to 160 million pounds per year. Its assessment of the *Phillips* probabilities would affect its willingness to accept particular terms. There is nothing to show what terms it would have agreed to, although we know it did not agree to a pre-paid license for $1.6 million, one-half down and one-half contingent on a favorable outcome in *Phillips*.

The unavoidable uncertainty as to Novamont's assessment in 1972 of the *Phillips* outcome may itself be a reason for concluding, contrary to the district court, that in

1974 when the parties used the language "remains in full force and effect and is uncancelled" they did not intend a reconstruction of their liabilities as if the MFL clause had been in force and availed of at the time of the 1972 Hercules agreement.

Assuming that they so intended, however, Paragraph 1 of the MFL clause requires that licensor shall furnish the full text of the royalty provisions of the second license. Under a natural reading of the term "royalty provisions," Paragraph 1 was substantially fulfilled when Ziegler informed Novamont that the Hercules lump sum royalty for 600 million pounds a year was $1.6 million, one-half payable immediately, and one-half on a favorable *Phillips* decision on validity.

The natural reading of Paragraph 2 of the MFL Clause gave Novamont the right, upon written request within ninety days, to a pre-paid license for the same lump sum, and quantity similarly payable. Under that reading Novamont's failure to make a request ended the matter. Novamont would contend, however, for a construction permitting it to take a pre-paid license for the quantity of its choice based on such similar or comparable considerations, components, and methods of computation so that the royalty provisions could be deemed equally favorable. Presumably there would be some difficulty in achieving equality. For example, it appears that one of the considerations in computing the Hercules lump sum was an assessment of the probability that it would achieve the production it planned. Although the license authorized 600 million pounds annually the probability that Hercules would reach that level may well have been different from the probability that Novamont would reach the level it chose.

The district court suggested that the term "all of the provisions of such other license" can mean "all of the provisions pertaining to the method by which the lump-sum payment . . . was calculated." 518 F.Supp. 573. Really to complete the thought, it would be necessary to construe Paragraph 2 so as to entitle the Licensee to

substitute for his license "all of the provisions of such other license, including, where the other license is a license for a specified quantity, to be pre-paid by a lump sum, a provision for a pre-paid license for a quantity chosen by the Licensee in return for a lump sum calculated by the methods by which the lump sum was calculated for the quantity specified in the other license."

If "all of the provisions" in Paragraph 2 be so construed, it would seem to follow that "royalty provisions" in Paragraph 1 should be similarly construed, so that the licensor would have been obligated to supply all the information concerning the method of calculation. "Method" in each case would have to include the assumptions to which the mathematical computations were applied.

With all respect, these constructions seem overstrained. Because of imponderables which seem to have been involved in the Novamont-Ziegler-Hercules situation, and would frequently be involved in working out terms which would maintain competitive equality, these constructions would place the court in the position of an arbitrator.

We are unaware of any New York decision to give us guidance as to New York law on the point, and of a decision of any court which would support this extent of departure from ordinary meaning of the contract language. Moreover, the two decisions which deal with somewhat related problems counsel closer adherence to the ordinary meaning.

In *Hazeltine Corporation v. Zenith Radio Corporation,* 100 F.2d 10 (7th Cir.1938), *cert. denied,* 306 U.S. 656, 59 S.Ct. 646, 83 L.Ed. 1054 (1939), Zenith was found to be entitled to a standard license under which the royalty rate was 3% of selling price of some items and 1½% of others. Alternatively each licensee could elect to pay $150,000 per year for an unlimited volume. Zenith also had the benefit of what amounted to an MFL agreement that "the rate of royalty specified in [its] license shall be as low as the lowest rate of royalty specified in any other license." Id. at 12. Zenith contended

that because a large producer electing the lump sum royalty per year could achieve a percentage rate per unit lower than the 3% or 1½%, the MFL agreement entitled Zenith to the lowest percentage rate so achieved.

In deciding against Zenith on this claim, the court said:

> In view of the vital and significant differences between a fixed sum per period rate of royalty and a percentage of selling price rate of royalty we are of the opinion that the two rates of royalty are substantially different types and that there is no basis in fact for the conversion of a lump sum rate of royalty into a rate of per cent of selling price royalty. The former is a true alternative to the latter and must be so treated in determining the rights of Hazeltine and Zenith in respect to royalty provisions under the option contract.

100 F.2d at 18.

The shoe was on the other foot in *Cardinal of Adrian, Inc. v. Amerock Corp.,* 208 U.S.P.Q. 822 (E.D.Mich.1979), *affirmed by unpublished order,* 698 F.2d 1218 (6th Cir. 1982). The licensor granted a new licensee (Weiser) a pre-paid license (with no limit on quantity) for $84,000. Amerock, an existing licensee, sought a pre-paid license for $84,000 under its MFL clause. The licensor argued that Amerock produced a much larger quantity and offered a license at Weiser's effective rate per unit. Then Chief District Judge Kennedy, now Circuit Judge, declined the construction Cardinal wanted, converting a pre-paid lump sum royalty into an equivalent per unit royalty, saying that Weiser had purchased the right to make as many units as it wanted, and Amerock was entitled to the same right for the same lump sum royalty.

It should be noted that the customizing contended for in those cases would have required only a simple mathematical computation, and not the assumptions and estimates required here.

We decline to construe the MFL clause as entitling an MFL licensee to the type of customizing of the royalty provisions of the second license sought by Novamont.[7]

## V. Claims of Fraud

In part, Novamont bases its claim of fraud on Ziegler's nondisclosure of the paragraph of the 1970 letter to Diamond promising that recovery for past infringement would be additively credited to the down payment under the 1970 Diamond license; on nondisclosure of the 1970 copolymer option granted to Diamond; and on several statements by Ziegler representatives in 1971 which may have artfully led Novamont's people to believe that Ziegler would exact more substantial damages from Diamond for past infringement than Ziegler truly did and that there were no agreements with Diamond other than those disclosed to Novamont.

We have concluded, as did the district court, that Novamont's MFL clause did not entitle Novamont to information on these subjects nor to the benefit of the undisclosed agreements. 518 F.Supp. at 575–76. It follows that these nondisclosures and allegedly misleading statements did not constitute fraud on Novamont with respect to its enforcement of its MFL rights.

In further part, Novamont bases its claim of fraud on Ziegler's refusal to furnish the full text of the 1972 Hercules agreement and on allegedly false representations on the discounts allowed in arriving at the $1.6 million lump sum for the Hercules pre-paid license. In particular the 20% so called contingency discount was not disclosed. The district court found that there was no misrepresentation in characterization of the lump sum payment and that Novamont failed to establish knowing misrepresentation of the manner of calculation of the

7. We are mindful of our holding that Novamont's claim to substitution of Diamond's 1970 license provisions did not survive the 1974 Novamont/SGK Agreement. Although the facts giving rise to Novamont's claim to provisions equivalent to the Hercules pre-paid

license also occurred before 1974, Novamont was allegedly unaware in 1974 of some of the facts which were critical to its theory, and we do not rest our decision with respect to the Hercules license on the 1974 agreement.

lump sum. 518 F.Supp. at 575–76. We do not consider these findings clearly erroneous.

In any event we have concluded that Novamont's MFL clause did not entitle Novamont to information as to the method of calculation of the lump sum nor to the benefit of a customized pre-paid license for a different quantity.

█ Novamont appears to argue that, apart from any effect on its MFL rights, the nondisclosures and alleged misrepresentations fraudulently induced Novamont to make the July 1, 1974 agreement with SGK on which this action was brought. Novamont contends that the fraud provided a complete defense and a basis for punitive damages.

The district court did not deal with this argument, either in its published opinion after trial, 518 F.Supp. 557, nor in its unpublished opinions on post-trial motions. In view of the care with which the court dealt with the issues, this point may not have been urged with much force.

Novamont and Ziegler carried on negotiations from time to time from the fall of 1970 until July 1, 1974 after the appellate decision in the *Phillips* case, when the existing agreement was signed. Shortly before that, Novamont became aware of the full text of the Hercules agreement, previously denied it.

We can understand that if Novamont had been aware of the terms of the infringement settlement with Diamond, Novamont would have included that treatment in its arguments during the course of negotiations. In that general sense the information may be considered material.

Novamont has failed, however, to point out that the treatment of Diamond or Hercules in these respects is material to any provision of the 1974 agreement, or that Novamont relied to its detriment on any misconception of these facts in making the agreement.

Insofar as the judgment awarded Novamont damages on its counterclaim and provided that each party shall bear its own costs, it is reversed, and the cause remanded with directions to restore the full award to plaintiff, without offset, and to reconsider the matter of costs in the light of the outcome of these appeals. In all other respects, the judgment is affirmed. Plaintiff shall recover its costs on appeal.